Emiley SUND; Andrea Sund, minors, by and through their parent and next friend, Pamela Sund; Pamela Sund, individually; Richard N. Sutton, M.D.; Joseph C. (Jace) Shelton; Lois Gallenberger; Tom Fairclough; Nancy Horvath; Michael Land; Vernon Raschke; La Verna L. Sobiesk; Emory J. Sobiesk, M.D.; Blair P. Coleman; Ann B. Coleman; Mildred Gore Lancaster; Bob G. Baggott, Sr.; Dan Lewandowski; Michael Bauman, a minor, by and through his parent and next friend, Mitch Bauman; Mitch Bauman, individually, Plaintiffs,

v.

CITY OF WICHITA FALLS, TEXAS; Jim Berzina, in his official capacity as City Manager for the City of Wichita Falls; and Linda Hughes, in her official capacity as Library Administrator of the Wichita Falls Public Library, Defendants.

No. Civ.A.7:99–CV–155–R.

United States District Court,
N.D. Texas,
Wichita Falls Division.

Sept. 20, 2000.

John K. Horany, Law Office of John K. Horany, Dallas, TX, Robert Morgan Hampton, True & Schrandt, Wichita Falls, TX, for plaintiffs.

Mark T. Price, Wichita Falls, TX, for defendants.

## AMENDED MEMORANDUM OPINION

BUCHMEYER, Chief Judge.

This case involves the censorship of two acclaimed books, *Heather Has Two Mommies,* by Leslea Newman (Alyson Wonderland Publications 1989) and *Daddy's*

*Roommate* by Michael Willhoite (Alyson Wonderland Publications 1990).[1] Both are children's picture books—*Heather* is a 46–page black and white book, and *Daddy's Roommate* is 32 pages in color—written for very young children about the subject of children who have gay and lesbian parents.

The two Books have been endorsed by educators, psychologists, and librarians. Indeed, Linda Hughes—the Library Administrator of the Wichita Falls Public Library—feels strongly that *Heather* and *Daddy's Roommate* are "a wonderful way to explain to children that you may live in a different lifestyle, but the important thing is people love you."[2]

As discussed below, the City Council of Wichita Falls—by a four to three vote—passed a Resolution which gave 300 people with library cards the right to censor *Heather Has Two Mommies* and *Daddy's Roommate,* by having these Books removed from the children's section of the Library and placed in the adult book section. This opinion holds that this unique Resolution is unconstitutional under the First and Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Texas Constitution.

### The Two Books

In September 1997, the Wichita Falls Public Library purchased two copies of *Heather Has Two Mommies* and two copies of *Daddy's Roommate* ("the Books") in accordance with the Library's Collection Development Policy. That is, the Library's Collection Manager had received more than four requests that the titles be considered for purchase—and there had been multiple Inter–Library Loan requests for the Books. Before the purchase, both the Collection Manager and

Library Administrator, Linda Hughes, had checked professional reviewing publications and recommended bibliographies of youth materials for titles on the subject of homosexual parents.

*Daddy's Roommate* was the first book written for children of gay men. The full-color illustrations depict a boy, his father, and his father's partner "as they take part in activities familiar to all kinds of families: cleaning the house, shopping, playing games, fighting, and making up." A review of the book in *Publishers Weekly* states:

> "[The] text is suitably straightforward, and the format is easily accessible to the intended audience. The colorful characters with their contemporary wardrobes and familiar surroundings lend the tale a stabilizing air of warmth and familiarity."[3]

*Heather Has Two Mommies* tells the story of the 3–year–old daughter of a lesbian couple, "who sees nothing unusual in having two mommies. When she joins a playgroup and discovers that other children have 'daddies,' her confusion is dispelled by an adult instructor and the other children who describe their own different families," such as Joshua, who has a mommy and stepfather, and David, whose two brothers and sisters are not the same color as he is because they are all adopted. (*See* Exhibit 1 to Plaintiffs' Amended Complaint.)

Before the library's purchase of *Heather* and *Daddy's Roommate,* the Library collection had no other titles on the subject of children with gay parents for children from preschool to the sixth grade. After two copies of each book were purchased by the Library, they were catalogued—one

---

1. *Daddy's Roommate* was awarded the Lambda Literary Award for children's books aimed at readers ages 2–6. Leslea Newman, the author of *Heather Has Two Mommies,* has received the *Highlights for Children's Fiction* Award (1992) and a creative writing Fellowship from the Massachusetts Arts Foundation (1989).

2. Plaintiffs' Amended Complaint, p. 6

3. *See* Exhibit 2 to Plaintiffs' Amended Complaint.

copy of each in "Youth Picture Books" and the other copies in "Youth Reference"—and, on October 4, 1997, they were placed on the library's shelves.

### The Initial Attempts to Censor the Books

Before May of 1998, the Library received only two complaints about *Heather Has Two Mommies* and *Daddy's Roommate*. However, according to Library Administrator Linda Hughes, the Books had been checked out "only two or three times" during this period. However, in May 1998, a number of individuals and special interest groups began attempts to censor the Books—which they considered to be offensive and objectionable. These individuals and groups, many of whom objected to the perceived messages of *Heather* and *Daddy's Roommate* on religious grounds, felt as if they were waging a "moral battle" against the Books.

For example, Reverend Robert Jeffress—Pastor of the First Baptist Church in Wichita Falls, who first learned of the Books in May of 1998—checked out both copies of the two Books and refused to return them. Reverend Jeffress wanted to keep *Heather* and *Daddy's Roommate* out of the hands of members of his congregation—and anyone else in the community—because he objected vehemently to the perceived "homosexual message" of the Books. Indeed, Reverend Jeffress destroyed the Books, but later reimbursed the Library $54.00 for their cost—but only with the demand that Linda Hughes, Library Administrator, not purchase any replacement copies.

In response to the controversy surrounding the two Books, the Library Advisory Board—a nine-member advisory board that issues non-binding recommendations to the Library on circulation and collection issues—agreed to reconsider the appropriateness of the two Books for children. In June 1998, after careful consideration, the Advisory Board recommended that both *Heather* and *Daddy's Roommate* remain in the children's areas of the Library. Then, Library Administrator Linda Hughes placed both Books in the Youth Non–Fiction section of the Library, an area that targets juveniles ages 9 through 13.

### The Altman Resolution

Reverend Jeffress and others who wanted to ban the Books entirely from the Library next turned to the Wichita Falls City Council. At first, the Council rejected their attempts to ban *Heather Has Two Mommies* and *Daddy's Roommate.*

However, the City Council finally gave in to the relentless pressure and, on February 16, 1999, by a four to three vote, passed Resolution 16–99, which became known as the "Altman Resolution."[4] This Resolution was, without question, passed with the primary purpose of limiting access to the two Books by patrons of the Library. The Altman Resolution states:

RESOLUTION NO. 16–99

RESOLUTION OF THE CITY COUNCIL OF THE CITY OF WICHITA FALLS, TEXAS, ESTABLISHING A RIGHT OF THE PUBLIC TO PETITION REGARDING THE LOCATION OF CHILDREN'S MATERIALS IN THE WICHITA FALLS PUBLIC LIBRARY; DETERMINING THAT THE MEETING AT WHICH THIS RESOLUTION WAS PASSED WAS OPEN TO THE PUBLIC AS REQUIRED BY LAW.

BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF WICHITA FALLS, TEXAS, THAT:

*SECTION 1.* There shall be a right to petition with regard to materials placed in the children's areas created in the Wichita Falls Public Library, in

---

4. This Resolution was drafted and proposed by City Council Member William Altman, a Wichita Falls attorney.

which books or other publications meeting the criteria set out below shall be removed from the children's areas and placed in the adult areas of the library.

The criteria for removing materials from the children's areas of the library to the adult area shall be as follows:

1. Only materials marketed or designed primarily for children age twelve (12) and under shall be eligible for removal from children's areas;

2. At least three hundred (300) members of the library at least eighteen (18) years of age who hold valid library cards must sign a petition entitled "Petition Concerning a Publication in the Children's Areas of the Wichita Falls Public Library" setting forth substantially the following:

   a. This petition concerns the following publication: (description of publication);

   b. By our printing our first name, middle name or initial, and last name, and signing our usual signature on this petition, each of us do certify that we have read the above-referenced publication;

   c. *We believe that the material contained in such publication to be of a nature that it is most appropriately read with parental approval and/or supervision* (emphasis added);

   d. *We respectfully request that the above-captioned publication be removed from the children's areas of the library and placed in the adult areas* (emphasis added);

   e. We live within the city limits of Wichita Falls and have resided here for at least six (6) months. We have a valid library card from the Wichita Falls Public Library.

It is obvious that the Altman Resolution establishes a draconian procedure that permits 300 adults who have library cards—out of a total of over 100,000 residents in Wichita Falls—to censor any children's books to which they object (like *Heather Has Two Mommies* and *Daddy's Roommate*).

Under the Altman Resolution, a book must be removed from the children's area of the Library to the adult areas if, in the opinion of 300 petitioners—who may or may not have minor children—the book is "of a nature that it is most appropriately read with parental approval and/or supervision." Once petitions with 300 signatures by Library patrons are filed with the Library Administrator, the Altman Resolution requires her to remove targeted books from the children's area within 24 hours. *Linda Hughes, the Library Administrator, and her staff are not even given time under the Resolution to verify the signatures prior to the removal of the censored Books.*

By authorizing the forced removal of children's books to the adult section of the Library, the Altman Resolution places a significant burden on Library patrons' ability to gain access to those books. Children searching specifically for those Books in the designated children's areas of the Library will be unable to locate them. In addition, youths who simply wish to browse in the children's sections of the Library will never find the censored Books. Moreover, parents browsing the children's areas in search of books for their children will be unable to find the censored Books.

Although the Altman Resolution gives vocal minorities veto power over any children's book with which they disagree, the Resolution provides no recourse to those citizens who might be opposed to the removal petitions. That is, the Altman Resolution provides for no public hearing on a removal petition or the merits of a targeted book; nor does the Resolution allow the Library Advisory Board any role in the removal process.

The Altman Resolution effectively contains no right of review or appeal. After receiving a removal petition, the Library Administrator has 30 days to request that the City Manager seek a waiver from the City Council. However, the City Manager has complete discretion to deny the Administrator's request, and there is no right to appeal the City Manager's refusal to submit a waiver request to the City Council. Similarly, the Altman Resolution provides no right to appeal the City Council's rejection of a waiver request.

### The Petitions and Removal of the Books

On July 15, 1999, Linda Hughes, the Library Administrator, received petitions with over 300 signatures for the removal of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's areas of the Library. On the same day, Linda Hughes—as required by the Altman Resolution—removed all copies of the two Books from the Youth Non–Fiction section of the Library, and placed them in the adult section.

After this lawsuit was filed, the Plaintiffs sought a temporary injunction to require the return of the two Books to the children's section where they belonged. The Defendants consented to this injunction, and *Heather* and *Daddy's Roommate* were returned to their original and proper locations, pending the resolution of this litigation.

### FINDINGS OF FACT

The following are the Court's Findings of Fact and Conclusions of Law.

### The Plaintiffs

1. Plaintiff Pamela Sund, a resident of Wichita Falls and a part-time merchandiser there, is the mother of Plaintiffs Emiley Sund, age 12, and Andrea Sund, age 8. Both Emiley, an eighth grader, and Andrea, a third grader, have library cards at the Wichita Falls Public Library.

2. Plaintiff Richard N. Sutton, M.D. is a resident of Wichita Falls, where he practices medicine full-time.

3. Plaintiff Joseph C. (Jace) Shelton is a resident of Wichita Falls; he is an automobile mechanic.

4. Plaintiff Lois Gallenberger is a resident of Wichita Falls. She has two adult children and a 9–year–old granddaughter. She is also President of the local chapter of PFLAG (Parents and Friends of Lesbians and Gays).

5. Plaintiff Tom Fairclough is a resident of Wichita Falls; he is retired.

6. Plaintiff Nancy Horvath is a resident of Wichita Falls. She is a minister in the local Metropolitan Community Church, and has a 7 ½ year old son, Zachary.

7. Plaintiff Michael Land is a resident of Wichita Falls; he is an educator at Midwestern State University in Wichita Falls.

8. Plaintiff Vernon Raschke is a resident of Wichita Falls; he is a library card holder at the Wichita Falls Public Library. Reverend Raschke is also an ordained priest who recently served a local Episcopal church in Wichita Falls.

9. Plaintiffs La Verna I. Sobiesk and Emory J. Sobiesk, M.D. are residents of Wichita Falls. Mrs. Sobiesk is retired; her husband is a psychiatrist. Both are library card holders at the Wichita Falls Public Library.

10. Plaintiff Blair P. Coleman is a resident of Wichita Falls. He is a semi-retired physician, and a library card holder.

11. Plaintiff Ann B. Coleman is a resident of Wichita Falls; she is a library card holder and is retired.

12. Plaintiff Mildred Gore Lancaster is a resident of Wichita Falls, and a professor in Teacher's Education at

Midwestern State University in Wichita Falls.

13. Plaintiff Robert G. Baggott is a Colonel (ret.), U.S. Army, and is a resident of Wichita Falls. He joined this lawsuit because of the experiences of his parents in Nazi Germany. Plaintiff Dan Lewandowski is a resident of Wichita Falls, a library card holder, and a freelance technician.

14. Plaintiff Mitch Bauman is a resident of Wichita Falls; he is the father of an 8–year–old fourth grader at a local elementary school. Mr. Bauman teaches the second grade (7– and 8–year–olds) at a local elementary school.

## The Defendants

15. Defendant City of Wichita Falls, Texas ("Wichita Falls" or the "City"), is a city within Wichita County, Texas. The City owns, controls, and operates the Wichita Falls Public Library (the "Library"). The Wichita Falls City Council (the "Council") is the executive governing body of Wichita Falls, and is comprised of seven members elected by residents of Wichita Falls. The Council is responsible for overseeing the operation and maintenance of the City of Wichita Falls through the exercise of its powers outlined in the City Charter.

16. Defendant Jim Berzina is sued in his official capacity as City Manager of Wichita Falls; he is the chief executive officer of the City. Defendant Linda Hughes is sued in her official capacity as Library Administrator of the Wichita Falls Public Library. She is the highest administrative officer in the Wichita Falls Public Library system, and she testified strongly on behalf of the Plaintiffs in opposition to the censorship of the two Books.

## The Witnesses

17. The witnesses at trial included four of the named Plaintiffs (Mitchell Bauman, Lois Gallenberger, Bob Baggott, and the Reverend Nancy Horvath):

### Mitchell Bauman

18. Mitch Bauman, the father and next friend of minor Plaintiff Mitchell Bauman (age 9) is a second grade teacher, whose students are seven and eight years old. Both he and his son regularly use the Wichita Falls Public Library. Mr. Bauman strongly believes that *Heather Has Two Mommies* and *Daddy's Roommate* should be available for his son and for other children when they browse through the children's section to find books of interest to them.

19. Mr. Bauman testified that, in his opinion, both of the Books are "age appropriate" for his son and other children ages four to nine; that he determines what books are suitable for his son; and that he objects to having anyone else make that determination for his son or for other people's children. Finally, Mr. Bauman believes that *Heather* and *Daddy's Roommate* have been censored because he defines "censorship" as "restricting or limiting the access to music, literature, ideas, or artwork because someone [else] deems it objectionable."

### Lois Gallenberger

20. Plaintiff Lois Gallenberger, the mother of two adult children and a nine-year-old granddaughter, is the President of the Wichita Falls chapter of "PFLAG"—Parents, Family and Friends of Lesbians

and Gays[5]—which is primarily a support group for parents and families and friends of lesbians and gays.[6] Ms. Gallenberger became a Plaintiff in this case because she feels that there is little material available to children to learn about these topics, and that these Books should be placed where children are not intimidated by having to ask where to find them.

21. Ms. Gallenberger attended meetings of the City Council on both February 2 and February 16, 1999, at which the Council was considering a Resolution to allow 300 Library patrons to remove the Books from the children's section and place them in a restricted area. She spoke in opposition to this proposal on both occasions. (*See* Plaintiffs' Exhibits 1 and 2). Ms. Gallenberger also strongly believes that the children's section in the Library should have free, open access to "books about many subjects" on shelves that the children could reach—and that it was wrong for *Heather* and *Daddy's Roommate* to be moved to higher shelves in the adult book section where children could not find or reach the Books.

### Bob G. Baggott

22. Bob Baggott, a retired Army officer, joined this lawsuit as a Plaintiff because he believes "he is defending the Constitution of the United States." He views the situation with the Altman Resolution as being similar to the experiences that his Jewish parents suffered in Nazi Germany before migrating to this country. He strongly objects to the fact that the Resolution "doesn't allow him to have any say in the removal" of books from the children's section and their placement with adult books—so long as 300 Library patrons petition for the removal of *Heather Has Two Mommies, Daddy's Roommate,* or other children's books.

### Reverend Nancy Horvath

23. The Plaintiff Reverend Nancy Horvath is the Pastor of the Wichita Falls Metropolitan Community Church[7]—which has "a particular outreach ministry to gays, lesbians, bisexual, and trans-gender communities." She has been the life partner of Barbara Horvath–Zern for over 12 years. They have a 7 1/2–year–old son, Zachary Horvath–Zern—who was conceived in a way similar to that described in *Heather Has Two Mommies*—and they have raised Zachary since his birth.

24. Reverend Horvath became a Plaintiff in this lawsuit because "the decision being made with the Altman Resolution" critically affects her child and other children being raised in gay and lesbian homes. There are probably 13–14 children that utilize Reverend Horvath's church who are being raised in homes that are different; she feels that they have a right "to be able to read materials about their coming to be and about their homes and their families."

25. Zachary has been the subject of taunting by other children "because his moms are gay." He has reacted to fears and concerns about

---

5. There are approximately 26 members of the Wichita Falls PFLAG chapter.

6. Both Bauman and Gallenberger testified to the obvious: that there are children living in gay and lesbian homes in Wichita Falls.

7. The Wichita Falls Metropolitan Community Church is one of 330 churches that comprise the Universal Fellowship of Metropolitan Community Churches in 15 countries around the world.

their safety and, as a result, has required professional counseling. Reverend Horvath knows heterosexual parents who have used *Heather* and *Daddy's Roommate* in explaining Zach's situation to their children. She believes moving the Book to the adult section denies access to her son—because he does not think he can ask for a book in the adult section of the Library because of fear of embarrassment.

### Expert Witnesses

26. Two witnesses at trial testified as experts: the Plaintiff Dr. Mildred Gore (Lancaster) and Dr. Barbara Immroth.

### Dr. Mildred Gore

27. Dr. Gore has been on the faculty at Midwestern State University in Wichita Falls for over seven years. She teaches, among other things, special education methods courses, a research course for graduate students in counseling education, and a multi culture education course. Multi cultural education relates to people understanding that various cultures have different values, and deals with the values and the ways of communication that people have within a social group. The purpose of multi cultural education for teachers is to commit these teachers "to advocating for every child— for white children, for children of color, from all ethnic groups, all economic groups, wealthy, middle class, and poor, for girls and their particular vulnerabilities, and boys for theirs."

28. Multi cultural educators also advocate for children who are heterosexual, children who are homosexual, and children with all kinds of physical and functional disabilities. Multi cultural educators also advocate for children from all kinds of families—traditional, two-parent families, single-parent families, children who live with their grandparents, and for children who do not live with their biological families, for those children who are adopted, for those children in foster care, for those children who are in group homes, and for those children who are from parents who are gay and lesbian.

29. According to Dr. Gore's very credible testimony, children want—and need—books about children like themselves. It is, therefore, "important that books and libraries validate and speak to life experiences for children, because when children find nothing that speaks to who they are and to validate them, then they have feelings of insignificance and unimportance." This is particularly true of children of gay and lesbian parents—because "when children of gay and lesbian relationships go into libraries and look for books that speak about their life experiences—and they find that there are no books about people who are like me—then they feel insignificant, unimportant, and a person not of worth."

30. Similarly, Dr. Gore testified about the serious psychological damage that may be done to children of gay and lesbian parents by being told that books like *Heather Has Two Mommies* and *Daddy's Roommate* cannot be kept with other children's books—but "must be segregated and moved away from the books about good families and put with adult material." Dr. Gore also testified that:

The message sent to a child who is told that books concerning other children like himself cannot be kept with the other books about children is that there is something very wrong with you, your family is not good, and that

results in the child developing shame and guilt.

31. Dr. Gore also researched other children's books—besides *Heather Has Two Mommies* and *Daddy's Roommate*—that might be censored under the Altman Resolution because they have been banned in other places on religious grounds. She found that "complaints had been made about books dealing with evolution, cults, witches, witchcraft Weiga, astro-projection, fortune telling, divorce, drug abuse, alcoholism" and sex education—and that books "on just about any religion you could name have been objected to: Christian people have objected to books about Buddhism, and Islam, and people from those and other religions have complained about books about Christianity."

32. Dr. Gore also produced a list from the Freedom Forum on Line of the "top challenged books of 1997" and from the Freedom Foundation of Texas of 55 books pulled from the libraries of schools in Texas (Plaintiffs' Exhibit 6). She testified about efforts made to censor the following books on the following stated grounds:

a. *It's Perfectly Normal* by Robie Harris: challenged because it is a sex-education book;

b. *Goosebumps Series* by R.L. Stine: challenged because its stories are "too scary";

c. *Adventures of Huckleberry Finn* by Mark Twain: which has been challenged since its publication, initially because it was "rough, coarse, and inelegant, unsuitable for respectable people"; ironically, the book today is sometimes challenged as racist even though it was originally attacked for being too anti-racist.[8]

d. *I Know Why the Caged Bird Sings* by Maya Angelou: this autobiographical novel has increasingly been the focus of challenges in school libraries because of the descriptions of a rape she suffered as a child;

e. *The Alice Series* by Phyllis Reynolds Naylor: challenged for being sexually explicit and using offensive language;

f. *Of Mice and Men* by John Steinbeck: this short work by the Nobel prizewinning author is most often challenged for using offensive language or being unsuited for the age group;

g. *A Day No Pigs Would Die* by Robert Newton Peck: this coming-of-age story of a 13–year–old Shaker farm boy who must deal with the death of his father and his pet, has been challenged for being sexually explicit and using offensive language;

h. *The Giver* by Lois Lowry: a critically-acclaimed novel challenged for being violent and sexually explicit, for using offensive language, and for its treatment of infanticide and euthanasia;

i. *Kaffir Boy* by Mark Mathabane: an autobiographic work related to a black youth's coming of age in South Africa, which has been challenged for homosexuality, offensive language, and being unsuited for the age group.[9]

---

8. Complaints were made that the character Jim was too heroic for a slave.

9. See also *100 Banned Books* (Censorship Histories of World's Literature) by Nicholas J. Karolides, Margaret Bald, and Dawn B. Sova (Checkmark Books 1999)—which discusses the censorship of books on *"political grounds"* (e.g., *Animal Farm* by George Orwell, *Uncle Tom's Cabin* by Harriet Beecher Stow) ... on *"religious grounds"* (e.g., *The Bible*, *Oliver Twist* by Charles Dickens) ... on *"sexual grounds"* (e.g., *The Arabian Nights,*

33. It was Dr. Gore's expert[10] opinion—based on her professional experience, her review of materials in this case, and her education and background—that the moving of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's section to the adult section constitutes irreparable harm to children "because the child of a family of gay and lesbian parents who goes into the children's library and sees that there are books about children of straight parents, there are books about animals, but there are no books about a kid like me. This experience could and probably would, in fact, lead to damage to a child."

34. Dr. Gore also testified that there are many other children's books in the Wichita Falls Library that would be the target of censorship under the Altman Resolution. Indeed, from Dr. Gore's interview with Library Administrator Linda Hughes, she learned that Ms. Hughes has already received complaints against other children's books—including (a) *Humbug Witch* (child who dresses up as a pretend-witch); (b) *I Wish Daddy Didn't Drink So Much* (little girl dealing with her father's drinking problem); (c) *My Big Sister Takes Drugs* (boy's story who is dealing with his sister's drug use); (d) *Mommy and Me by Ourselves Again* (about divorce); (e) *Bunnies Wedding* (interracial relationship); and (f) *Through My Window* (interracial relationship).

35. It is also Dr. Gore's opinion that there are other children's books in the Library that might be attacked under the Altman Resolution. These include *Mommy, Where Do Babies Come From?*, which deals with sex education for children and which uses actual specific terms in describing human sex organs (i.e., vagina and penis); Joanna Cole's book on evolution called *The Human Body—How It Evolved;* and *Viewpoints—Equality of the Sexes,* which has raised religious objections.

36. Dr. Gore has, of course, read both *Heather Has Two Mommies* and *Daddy's Roommate.* She believes that they are no more sexually explicit than other books in the children's section of the Library. For example, *Heather* is no more explicit than *Mommy, Where Do Babies Come From?* —which has been in the children's section in the Library for over a quarter of a century.

37. In Dr. Gore's opinion, neither *Heather* nor *Daddy's Roommate* are immoral or pornographic, as claimed by Dr. Jeffress and others "who want to censor these two Books by removing them from the children's section of the Library where they belong."

#### Dr. Barbara Immroth

38. Dr. Barbara Immroth is a professor in the Graduate School of Library and Information Science at the University of Texas at Austin. She holds a Ph.D. in library and information science. Dr. Immroth teaches courses in materials and services to children, and management of school and public libraries—and she is a past President of the Texas Library Association, the

---

Sir Richard Burton, trans.) ... and on *"social grounds"* (e.g., *The Catcher in the Rye* by J.D. Salinger and *To Kill a Mockingbird* by Harper Lee).

**10.** Dr. Gore did research into literature of the children of gay and lesbian people, including an article called "Children of Gay and Lesbian Parents" by Dr. Charlotte Patterson (Plaintiffs' Exhibit 7).

largest state association in the country.

39. The expert testimony of Dr. Immroth was very credible.[11] It established the following: Libraries in Texas usually have a children's room or area to have an appropriate, uncensored collection of books that is inviting and accessible for children.

40. Dr. Immroth has reviewed *Daddy's Roommate* and *Heather Has Two Mommies.* In her opinion, the intended audience for these Books is older preschool-aged and early primary-aged children—*and these Books are appropriate for those children.* Dr. Immroth agrees that moving these Books from the children's section to the adult section of the Library places a significant burden on the Library patron's ability to gain access to the Books because they would not be in a place that the patron would expect to find such materials.

41. Indeed, it is Dr. Immroth's expert opinion that removing these two Books from the place that it would be appropriate to have them and to find them—to put them in another place in the library—would be, in effect, hiding them or keeping them out of the reach of the intended user. She feels this is, in effect, the same as banning the Books.

42. It is also Dr. Immroth's opinion that the Altman Resolution—which has petitioners state merely that "we believe the material contained in such publication to be of a nature that it is most appropriately read with parental approval and/or supervision"—does not identify "what criteria will be used to make the determination as to whether or not the materials in the books are most

appropriately read with parental supervision, and nothing in the Resolution tells what the standards are."

### Library Administrator Linda Hughes

43. Linda Hughes, the Library Administrator of the excellent Library in Wichita Falls, is only named as a nominal Defendant in this case. In fact, she is the real heroine of this unfortunate story of the censorship of two children's Books—and the unconstitutional interference with her ability to perform her duties in running the Library as a trained, skilled, and very competent professional. Ms. Hughes has a master's degree in library science, and she follows the code of ethics that governs professional librarians.

44. Under the direction of Linda Hughes, the Wichita Falls Public Library has this mission statement:

Given that access to information is essential to our democracy, the mission of the Wichita Falls Public Library is to act as a public information center for all citizens of Wichita Falls. To the extent that funding is available, acquisition and organization of quality and relevant print and non-print materials and services, either from our collections or through other libraries and information resources, will address education, informational, recreational, and cultural needs in surroundings that are welcoming and efficiently operated.

45. Linda Hughes directs the Wichita Falls Public Library in accordance with the American Library Association's Library Bill of Rights and

**11.** Dr. Immroth served as an expert witness without compensation because she felt "it was very important to uphold the ideal of [all library patrons] having access to a broad range of information."

Freedom to Read.[12] Exhibit 12 is the American Library Association's policy on free access to libraries for minors; it is an addendum to the library Bill of Rights.[13] Exhibit 10 is the welcome statement to the Wichita Falls Public Library from the library's website, which indicates that the Library is the resource center for the city of Wichita Falls.

46. Acting in accordance with this Bill of Rights, its addendum, and her library's welcoming statement, Defendant Linda Hughes admits that moving these two children's Books—*Heather Has Two Mommies* and *Daddy's Roommate* —out of the children's section to the adult section *will, in fact, result in an abridgment of freedom of expression and free access to ideas by limiting access to the Books.* She also admits that children will not be able to access these Books as readily browsing through the collection as they would if the Books were in the target area of access for children.

47. Prior to July 15, 1999, both copies of *Heather Has Two Mommies* and both copies of *Daddy's Roommate* were located—as they should have been—in the target area of access for children. However, under a policy on "challenged books" adopted by the Library Board[14] in 1989, *Heather Has Two Mommies* received two challenges; and *Daddy's Roommate* received one challenge.

48. These challenges were dealt with according to established Library policy. That is, the two Books were considered by a professional review committee and taken before the Library Advisory Board for citizen input. The members of the Library Advisory Board read the Books, allowed public input, and then voted to leave *Daddy's Roommate* in the picture book section and to move *Heather Has Two Mommies* to the juvenile nonfiction area of the children's section.

49. Defendant Linda Hughes then determined that—since these two Books had received so much attention—she would move both of them and put them together in the juvenile nonfiction area. However, she testified that it was important that the Books be kept in the juvenile section because the target audience of these two Books is juvenile—and that this "was not the same thing as taking the Books out of the children's section and putting them in the adult section."

50. Exhibit 18 is a copy of the holding's record for *Daddy's Roommate* and *Heather Has Two Mommies*. It shows that *Daddy's Roommate* was checked out approximately 120 times, 115 times since the controversy arose; and that *Heather Has Two Mommies* was checked out 117 times, 115 times since the controversy.

51. On February 16, 1999, the Altman Resolution (see page 5–6) was passed by the City Council by a four to three vote. Exhibit 16 contains the signed petitions received on both of the Books. When 300 signatures had been obtained, Linda Hughes was forced to remove both copies of *Heather Has Two Mommies* and both copies of *Daddy's Roommate* —and place (*really*

---

12. See Plaintiffs' Exhibit 11.

13. Exhibit 13 is the "Freedom to Read" statement, which also applies to the Wichita Falls Public Library.

14. The Library Advisory Board is appointed by the City Council to give direction and citizen input to the library.

*hide*) the Books in the adult section.

52. During a lunch break, Linda Hughes gave the Court and counsel a tour of the Wichita Falls Public Library. Exhibit 14 is a map of the Library which has a circle around the youth desk in the lower, right-hand corner, where the Books were first placed by the Library Administrator, and the area circled titled "Adult Nonfiction" is the location of the Books as mandated by the Altman Resolution.

53. In her experience as a Librarian at the City of Wichita Falls, Linda Hughes knows that there has never been another occasion where the City Council issued a resolution that gave her instructions on how to do her job as a professional librarian. Nor is Linda Hughes familiar with any other situation in other communities in which a city council or governing body directed the librarian to follow a petition process like the Altman Resolution in the removal of books from the children's sections of libraries.

54. The very credible testimony of Library Administrator Linda Hughes—who, as a professional, is knowledgeable about the contents of both *Heather Has Two Mommies* and *Daddy's Roommate*—also established the following facts:

a. It is in the public interest that these Books be kept in the juvenile non-fiction section so they will be available to children who may be browsing and to adults who may be looking for children's books concerning gay and lesbian parents;

b. It is her opinion that placing these Books in the adult section would drastically affect the accessibility of the Books for children[15]—particularly since, in her experience, children are reluctant to ask for help in finding books.

c. It took Linda Hughes three days to validate 300 signed petitions for removal presented in July 1999—even though, under the Altman Resolution, she had already been forced to place a hold on the two Books.

d. In her professional opinion, there is nothing about either *Heather Has Two Mommies* or *Daddy's Roommate* that is obscene, pornographic, inappropriate, or dangerous for children.

e. She has received oral complaints on books in the Library about evolution and sex education. Indeed, the Wichita Falls Public Library owns the book, *Where Did I Come From?*, by Peter Mayle, introduced as Court's Exhibit 1. *Where Did I Come From?* has nude pictures of mother and father in bed, showing their genitalia, and has not yet been the subject of any complaints. However, *Linda has very real concerns that any book for the target age of 12 and under could be removed from the children's section of the Library under the Altman Resolution.*

### Dr. Robert Jeffress

55. Dr. Robert Jeffress, who has been the Pastor of the First Baptist Church in Wichita Falls for over seven years, first learned that the Public Library owned *Heather Has Two Mommies* and *Daddy's Roommate* in May of 1998. On Mother's Day that year, Dr. Jeffress preached a sermon concerning these two Books—in which he stated that "as a culture we cannot condone what God has condemned" and that these two Books were a good illustration of that truth, and

---

15. There is a difference in shelving heights in the Wichita Falls Library between adult section shelves, which are 90 inches tall, and children's shelves, which are only 60 inches tall.

were objectionable on religious grounds.

56. Dr. Jeffress also stated that "if the City Council did not see that these Books were removed from the Library, *we will hold the City Council responsible for their vote come election time.*" In short, Dr. Jeffress is adamantly opposed to children having free access in the Library to *Heather Has Two Mommies* and *Daddy's Roommate.*

57. After Dr. Jeffress' comments about the Books were printed in the local newspaper, a "firestorm of controversy arose" about the Books. Exhibit 31 is an article from the **Wichita Falls Times and Record News** from June 24, 1998, concerning the Library Advisory Board hearing concerning *Heather Has Two Mommies* and *Daddy's Roommate.* In this article, Dr. Jeffress stated that, "Although the City Council wants to run away from this issue, we will not allow that"— and that Jeffress "intends to ask that the matter be placed on a formal council agenda."

58. Immediately after the heated controversy arose, a Deacon of the First Baptist Church arranged a luncheon between Dr. Robert Jeffress and City Council Member William Altman to talk about *Daddy's Roommate* and *Heather Has Two Mommies.*[16] After this luncheon, Dr. Jeffress did have some other contact with Mr. Altman from May 1998 to February 16, 1999, the day the "Altman Resolution" was passed by the City Council's four to three vote.

59. Besides *Heather* and *Daddy's Roommate,* Dr. Jeffress feels there are other books in the Public Library which should also be censored under the Altman Resolution. For example, the Court specifically asked Dr. Jeffress questions about another children's sex education book, *Where Do I Come From?,* by Peter Mayle [17]—a very colorful cartoon book which shows a husband and wife naked in bed before (and after) their baby daughter is conceived. Although Dr. Jeffress was not asked if this book should be moved to the adult section too, he did testify that he would be uncomfortable with his seven-year-old daughter having access to *Where Do I Come From?.*

### *(Reverend) Janie Hill*

60. The "Reverend" Janie Hill of "God Is Love Ministries, Inc.," is a lay minister who appears to have no church and no congregation. She was one of the leading protestors who wanted to remove Heather Has Two Mommies and Daddy's Roommate from the Wichita Falls Public Library. She believes the two Books are too sexually explicit for children—and that they are "supportive of the homosexual agenda across our nation to brainwash our littlest ones into this lifestyle which is a very destructive lifestyle that hurts."

61. She wrote many letters of protest to the newspaper; she authored several "viewpoints articles" that were also published; and—in a scene reminiscent of *Inherit the*

---

**16.** Council Member Altman, an attorney, is a member of Dr. Jeffress' congregation at the First Baptist Church.

**17.** The Wichita Falls Public Library does have this book; it is located in the juvenile nonfiction section, and is checked out about once every two months. Linda Hughes testified that she had never received any complaints about *Where Do I Come From?.*

*Wind*[18]—she appeared in court with a large sign reading "Jesus Loves You" and with a valentine-shaped box full of religious tracts that she handed out to the people in the courtroom (and left on the bench for the Court).

62. Janie Hill believes there are many other children's books in the Public Library that should be censored. Exhibit 35 is a letter dated July 2, 1999, written by Janie Hill on the letterhead of God Is Love Ministries, Inc., which details other explicit homosexual books in the Library as well as pornography, books on witchcraft, etc. Exhibit 34 is a packet of religious and anti-homosexual material she mailed directly to the Court.

### The City Council Members

63. Four other witnesses at trial were members of the City Council who voted on the Altman Resolution.

### Don Johnston

64. Former Council Member Don Johnston became aware that the Wichita Falls Public Library owned *Heather Has Two Mommies* and *Daddy's Roommate* by means of the media coverage of Dr. Jeffress' May, 1998 sermon. During his four years on the City Council, there had never been another occasion where complaints about the placement of materials in the Library was discussed by the City Council.

65. According to Mr. Johnston, despite the fact that *Heather Has Two Mommies* and *Daddy's Roommate* are not specifically named in Resolution 16–99, "they are the only two Books ever challenged under that Resolution." He cannot recall any other time when a decision made by the Library Administrator was subject to a separate resolution prior to the Altman Resolution—*and to do so would be out of order* in his opinion.

66. Mr. Johnston also feels that what Resolution 16–99 does is to take *Heather Has Two Mommies* and *Daddy's Roommate* and "place them in a separate area so that if a child were to be browsing in the children's section, they would not accidentally find the books."

### Bud Beaty

67. City Council Member Bud Beaty believes the City Council is obligated to censor children's material and he "does not have a problem with censoring children's material." However, Mr. Beaty voted to censor *Heather Has Two Mommies* and *Daddy's Roommate* even though he had never read either of the Books!

68. While Council Member Beaty has been on the Wichita Falls City Council, there has never been another instance where a resolution was passed that allowed a group of citizens—whether "they be 100, 300, 250, or 1,000 to overrule the decision of a department head of the City of Wichita Falls."

69. Mr. Beaty also testified that although Resolution 16–99 does not mention any specific book title, it is obvious that it was passed as a result of the controversy over *Heather Has Two Mommies* and *Daddy's Roommate*. He does feel that it would be fair to give those opposed to the removal of books a way to challenge the removal of

---

**18.** *Inherit The Wind,* by Jerome Lawrence and Robert E. Lee (Random House Sept. 1955), is (of course) the acclaimed play and movie about the "Scopes Monkey Trial" in Tennes-see—in which *Clarence Darrow* (Henry Drummond) cross-examines his opposing counsel, *Wm. Jennings Bryan* (Matthew Harrison Brady) about the Bible.

books under Resolution 16–99, although he conceded that "citizens who oppose moving books under Resolution 16–99 should have a right to be heard."

### Angus Thompson

70. Council Member Angus Thompson also believes that access to these two Books, *Heather Has Two Mommies* and *Daddy's Roommate* should be restricted—even though he has not read either book. He does understand that the Books' purposes are to explain the lesbian and homosexual lifestyles on a level that children can understand—and he came to this understanding from reading a newspaper and discussions in the City Council meetings.

### William K. Altman

71. William Altman is an attorney who serves on the Wichita Falls City Council; he is a member of the First Baptist Church, and the author of the original version of Resolution 16–99. Dr. Jeffress asked Council Member Altman to bring the issue over *Heather Has Two Mommies* and *Daddy's Roommate* to the City Council—and, in the week Resolution 16–99 was introduced, Altman saw Dr. Jeffress and said, "I'm going to have a resolution probably at the next council meeting that you might have some interest in."

72. Council Member Altman agrees that a child browsing in the children's section will not likely find a book in that section if the book has been moved to another section. However, he proposed the Altman Resolution because he wanted "to make the Library as comfortable as possible to the entire public as he possibly could without infringing on the rights in any way, *other than perhaps in a minuscule way,* of

anybody." His Resolution contained no appeal process for the banned books because "the appeal process was designed to stop the Resolution in working in a way that would be *appalling to everybody.*"

73. Mr. Altman also concedes that, if there had not been a controversy over these two Books, *Heather Has Two Mommies* and *Daddy's Roommate,* Resolution 16–99 would never have been passed.

### City Manager Jim Berzina

74. Defendant Jim Berzina has been the City Manager of Wichita Falls since June 27, 1983. During his tenure as City Manager, he has never seen the City Council enact a resolution that purports to set up a process for petitions to counteract some decision made by the library—such as Resolution 16–99.

75. Mr. Berzina believes that the Library Advisory Board is the location for citizen input to the running of the Public Library. In this case, the Library Advisory Board considered the complaints concerning these two Books—and their determination was that the Books should have been maintained in the children's section of the library.

76. When interviewed by the newspaper after the Resolution passed, Defendant Berzina stated that he would not submit a request to the City Council to approve a waiver as to *Heather Has Two Mommies* and *Daddy's Roommate* owing "to the fact that these two Books had been the source and subject of much controversy and that it had taken a protracted period of time to come to a decision and that to bring a waiver request back to the Council would be insulting to the Council's intelligence."

77. Defendant Berzina admitted that Linda Hughes has received no negative complaints apart from this controversy about *Heather Has Two Mommies* and *Daddy's Roommate* —and that she is an excellent Library Administrator who knows her subject area and exercises appropriate skills and judgment in carrying out her function as Library Administrator.

## CONCLUSIONS OF LAW

1. This Court considered four factors in issuing the preliminary injunction in this case: (a) the Plaintiffs' likelihood of success on the merits; (b) whether the Plaintiffs were likely to suffer irreparable harm if the injunction is denied; (c) whether threatened injury to the Plaintiffs outweighed any harm that the injunction might cause to others; and (d) the impact of the injunction on the public interest. *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir.1998).

2. The issuance of the temporary injunction was proper because Plaintiffs showed a need for immediate relief to avoid irreparable injury and to preserve the status quo pending resolution of the merits of the case. *See State of Texas v. Wellington Resources Corp.*, 706 F.2d 533, 537 (5th Cir.1983); *Merrill Lynch v. Chapman*, No. Civ A 3:98–CV–1965–D, 1998 WL 792501, at *2 (N.D.Tex. Nov. 3, 1998); Fed. R.Civ.P. 65(b).

3. At the trial on the merits, the Plaintiffs clearly established their right to a permanent injunction against the Defendant, The City of Wichita Falls, the Defendant, Jim Berzina, in his official capacity as City Manager for the City of Wichita Falls, and Linda Hughes, a nominal Defendant in her official capacity as Library Administrator of the Wichita Falls Public Library.

4. The Altman Resolution, both on its face and as applied to the removal of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's area of the Library to the adult section, violates Plaintiffs' federal and state constitutional rights to receive information. The Resolution and the Book removals burden fully-protected speech on the basis of content and viewpoint and they therefore cannot stand.

5. The First Amendment to the United States Constitution, and Article I, Section 8 of the Texas Constitution, indisputably protect the right to receive information, *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997)—*a fundamental right that is enjoyed by both adults and children. See, e.g., Board of Education v. Pico*, 457 U.S. 853, 867–68, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) (noting that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom," and clarifying that "students too are beneficiaries of this principle"); *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 190 (5th Cir.1995).

6. The right to receive information is vigorously enforced in the context of a public library, "the quintessential locus of the receipt of information." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992). *See also, e.g., Pico*, 457 U.S. at 868, 102 S.Ct. 2799, 73 L.Ed.2d 435 (noting that "public library is 'a

place dedicated to quiet, to knowledge, and to beauty'") (quoting *Brown v. Louisiana*, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966)); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir.1976) ("A library is a mighty resource in the free marketplace of ideas."). In *Pico*, for example, the Supreme Court made clear that government officials may not remove books from school library shelves "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico*, 457 U.S. at 872, 102 S.Ct. 2799 (quoting *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). *See also, e.g., Campbell*, 64 F.3d at 190 (same).

7. The principles set forth in *Pico* —a school library case—have even greater force when applied to public libraries. Although it confirmed that the state may not "contract the spectrum of available knowledge" by restricting books on the basis of their message or viewpoint, *Pico*, 457 U.S. at 886, 102 S.Ct. 2799, the *Pico* plurality acknowledged that public schools have an "inculcative" function that affords school boards greater discretion in curricular matters. *Id.* at 846, 102 S.Ct. 2799. By contrast, public libraries do not serve the same inculcative functions, and instead are, as even Justice Rehnquist's *Pico* dissent recognized, "designed for freewheeling inquiry." *Id.* at 915, 102 S.Ct. 2799 (Rehnquist, J., dissenting).

8. The Wichita Falls Public Library, like all other public libraries, is a limited public forum for purposes of First Amendment analysis.

*See Kreimer*, 958 F.2d at 1259; *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library*, 24 F.Supp.2d 552, 563 (E.D.Va.1998). This point is conceded by Defendants. In a limited public forum, the government's ability to restrict patrons' First Amendment rights is extremely narrow. Thus, the City cannot limit access to library materials solely on the basis of the content of those materials, unless the City can demonstrate that the restriction is necessary to achieve a compelling government interest and there are no less restrictive alternatives for achieving that interest. *See, e.g., International Soc'y of Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

9. Where, as here, a speech regulation targets not only the content of expression, but also its perceived viewpoint, judicial scrutiny is even more exacting. *See, e.g., Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (noting that "[v]iewpoint discrimination is . . . an egregious form of content discrimination").

10. The Altman Resolution, and the City's subsequent removal of the two Books, constitutes impermissible content-based and viewpoint-based discrimination. From a review of the history of the Resolution, it is clear that the ordinance was enacted specifically for the purpose of suppressing *Heather Has Two Mommies* and *Daddy's Roommate*. *See* Amended Complaint, ¶¶ 28–33 (describing earlier attempts to censor the Books). When opponents of the Books failed to censor the Books outright,

they sought to accomplish indirectly what they could not do directly.[19]

11. On its face, the Resolution permits any 300 Library card holders to remove a book from the children's area of the Library to the adult section if, in their opinion, the book is "most appropriately read with parental approval and/or supervision." Altman Resolution, § 1(2)(c). Not only does this language allow any special interest group to suppress Library materials on the basis of their content, it actually facilitates an infinite number of content—and viewpoint-based speech restrictions. Under the Resolution, any group of patrons with a particular viewpoint or agenda can suppress books with which they disagree, from *Heather Has Two Mommies* and *Daddy's Roommate* to, conceivably, the children's Bibles located in the youth areas of the Library.

12. By conferring upon any 300 patrons[20] the power to remove from the children's section any books they find objectionable, the Altman Resolution unconstitutionally confers a "heckler's veto" on the complaining patrons, effectively permitting them to veto lawful, fully-protected expression[21] simply because of their adverse reaction to it. The Supreme Court repeatedly has invalidated other "heckler's veto" regulations as antithetical to core First Amendment values. *See, e.g., Reno,* 117 S.Ct. at 2349 (noting that "heckler's veto" gives "broad powers of censorship" to "any opponent of indecent speech"); *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134–35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Speech cannot be ... burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."); *Brown v. Louisiana,* 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) ("Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence."). The Altman Resolution is similarly invalid.

13. The Defendants argue that Plaintiffs' First Amendment rights are not implicated because no book is actually physically removed from the building. Although, under the Altman Resolution, petitioned books are not banned entirely from the Library, *the burdens on Plaintiffs' First Amendment rights imposed by the Resolution are nonetheless constitutionally objectionable.* Even where a regulation does not silence speech altogether, the Supreme Court has given "the most exacting scrutiny

19. In advancing their overall "moral" agenda, opponents of the Books have made no pretenses about their objectives. For instance, organizers of the removal petition effort have circulated another petition, calling for passage of a federal law that would deprive federal courts of jurisdiction "to make any decision, or issue any order concerning the matter of material *censored* in any ... library." Petition of Committee to Restore Decency to the Library, Mar. 12, 1999 (emphasis added).

20. Three hundred patrons would be a minuscule proportion (.003%) of the total population of Wichita Falls, which is over 100,000 persons.

21. The Altman Resolution applies only to materials "marketed or designed primarily for children age twelve and under." Altman Resolution, § 1(1). By definition, those materials must have been previously approved and deemed appropriate for children pursuant to established Library selection policies. In fact, *Heather Has Two Mommies* and *Daddy's Roommate* have been approved under the Library's standard procedures, reevaluated, and approved a second time. *See* Amended Complaint ¶¶ 28, 32.

to regulations that *suppress, disadvantage, or impose differential burdens* upon speech because of its content." *Turner Broadcasting, Inc. v. FCC*, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (emphasis added). *See also, e.g., Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 2418, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part and dissenting in part) ("[T]he possibility the Government could have imposed more draconian limitations on speech never has justified a lesser abridgment. Indeed, such an argument almost always is available; *few of our First Amendment cases involve outright bans on speech.*") (emphasis added); *United States v. National Treasury Employees Union*, 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (invalidating statute barring receipt of honoraria by government employees, even though statute did not "prohibit any speech"); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (striking down law imposing minimal fee on parade permits); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating statute that imposed financial burden on speech but did not ban any expression).[22]

14. By authorizing the forced removal of children's books to the adult section of the Library, the Altman Resolution places a significant burden on Library patrons' ability to gain access to those books. Children searching specifically for those books in the designated children's areas of the Library will be unable to locate them. In addition, children who simply wish to browse in the children's sections of the Library will never find the censored books. Moreover, parents browsing the children's areas in search of books for their children will be unable to find the censored books.

15. The burden imposed by the Altman Resolution is, therefore, analogous to the restriction struck down by the Supreme Court in *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). In *Denver Area*, the Court invalidated a requirement that "patently offensive" cable programming be segregated, blocked, and made unavailable to viewers unless they specifically requested access in advance and in writing. *Id.* at 2394. Although the regulation did not ban the "patently offensive" programming outright, the Court concluded that it had "obvious restrictive effects," noting that "[a] subscriber cannot decide to watch a single program without considerable advance planning...." *Id.* at 2391. Similarly, although the Books censored under the Altman Resolution are available in the adult section of the Library, they can only be located if a patron knows *in advance* that she wants those specific titles or authors. Just as the cable regulation in *Denver Area* impermissibly burdened the rights of television viewers who wished to "channel surf," *see id.* at 2391 ("These restrictions will prevent programmers from

---

22. *See also, e.g., Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227–31, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

broadcasting to viewers who select programs day by day (or, through 'surfing,' minute by minute)."), the Altman Resolution unconstitutionally burdens the First Amendment rights of browsing Library patrons.[23] It would be absurd to conclude that the Altman Resolution imposed no additional burdens on targeted materials—for if this was true, then the Resolution would do absolutely nothing to advance the purported interest in having children read these Books "with parental approval and/or supervision."

16. As content- and viewpoint-based restrictions on Plaintiffs' right to receive information, the Resolution and Book removals are constitutionally infirm because they are not narrowly tailored to serve a compelling state interest. *See, e.g., ISKCON*, 505 U.S. at 678, 112 S.Ct. 2701.

17. Defendants also seem to justify the Resolution as a means of supporting some notion of "parents' rights," presumably involving the right to direct the upbringing of one's children. The Altman Resolution, however, permits *any* 18–year–old Library card holder to sign a removal petition and does not limit its scope to offended *parents.* Altman Resolution, § 1(2). Petition signatories can be people who have never used—and will never use—the children's areas of the Library. In addition, even where the signatory is a parent, the Resolution allows that parent to mandate what information an-

other parent's children may or may not receive. Thus, the Altman Resolution can hardly be said to support "parent's rights," as it permits a non-parent to dictate what someone else's children may read and allows one parent to suppress material not only for her own children, but for all others in the community.

18. Moreover, if a parent wishes to prevent her child from reading a particular book, that parent can and should accompany the child to the Library, and should not prevent all children in the community from gaining access to constitutionally protected materials. Where First Amendment rights are concerned, those seeking to restrict access to information should be forced to take affirmative steps to shield themselves from unwanted materials; the onus should not be on the general public to overcome barriers to their access to fully-protected information. *See, e.g., Denver Area,* 116 S.Ct. at 2394; *Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (striking requirement that recipients of Communist literature notify the Post Office in advance that they wish to receive those materials). The Altman Resolution, therefore, places an unconstitutional burden on Plaintiffs' right to receive information under the First Amendment and Article 1, Section 8 of the Texas Constitution.

19. The Defendants' extensive reliance on the Second Circuit's 1972 deci-

---

**23.** In addition, because the only children's books located in the adult sections of the Library will be those removed under the Altman Resolution, the Resolution attaches an unconstitutional stigma to the receipt of fully-protected expressive materials. *See, e.g., Denver Area,* 116 S.Ct. at 2391 (noting that "'written notice' requirement will further restrict viewing by subscribers who fear for their reputations...."); *Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (striking requirement that recipients of Communist literature notify the Post Office that they wish to receive those materials.)

sion in *Presidents Council, Dist. 25 v. Community School Bd. No. 25,* 457 F.2d 289 (2d Cir.1972) is wholly inexplicable. In support of their *strained argument,* that the First Amendment is not implicated at all in this case, Defendants place great weight on *Presidents Council*—a case that was later overruled by the Second Circuit and the Supreme Court in *Pico. See Pico v. Board of Educ.,* 638 F.2d 404, 419 (2d Cir.1980) (Mansfield, J., dissenting) (noting that the majority's decision in *Pico* "overrules our ... decision ·in the indistinguishable case of *President[ ]s Council* "), aff'd. sub nom *Board of Educ. v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). Indeed, as the Defendants have tried to suggest here, the district court in *Pico* erroneously relied on *Presidents Council* to conclude that "restricted access ... to certain books ... does not constitute a sharp and direct infringement of any First Amendment right." *Pico,* 457 U.S. at 860 & nn. 13–14, 102 S.Ct. 2799 (quoting district court decision, 457 F.Supp. at 397). Both the Second Circuit and the Supreme Court rejected that notion—and this Court will do the same.

20. Defendants' claim that the City has a compelling interest in "shielding minors from an influence of literature that is not obscene by adult standards," is similarly off the mark. It is true, as Defendants argue, that states may regulate children's access to materials not deemed obscene for adults; however, such regulation is permissible only where the restricted materials meet the stringent test for obscenity as to children, or "harmful to minors." *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 213, 95 S.Ct. 2268, 45 L.Ed.2d 125 ("Clearly all nudity cannot be deemed obscene even as to minors.") *See Ginsberg v. New York,* (390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). Nor can such a broad restriction be justified by any other governmental interest pertaining to minors. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." (footnote omitted). Here, the Defendants have not made—and, indeed, could not possibly make—the suggestion that the targeted Books are "obscene as to children" in the legal sense. There simply is no interest, *let alone a compelling one,* in restricting access to non-obscene, fully-protected library books solely on the basis of the majority's disagreement with their perceived message.

21. It is well-established that " 'a law fails to meet the requirements of the Due Process Clause if it is so vague and standard less that it leaves the public uncertain' " as to what conduct it covers. *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1859, 144 L.Ed.2d 67 (1999) (plurality opinion) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). The language of the Altman Resolution is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Smith v. Goguen,* 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (citations omitted). The Altman Resolution provides absolutely no standards at all, other than the open-ended language referring to children's books that, in the opinion of petition signatories, are "most appropriately

read with parental approval and/or supervision." Altman Resolution, § 1(c). The Resolution contains no further explanatory language and no limitations on the criteria that may be used to determine a book's "appropriateness." In addition, by granting removal power to any group of Library patrons at any time, the Resolution impermissibly creates a risk of arbitrary and discriminatory application. *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

22. The Altman Resolution is also flawed in its failure to provide adequate means for timely review and appeal of the removal decisions. After receiving a removal petition, the Library Administrator has 30 days to request that the City Manager seek a waiver from the City Council. Altman Resolution, § 1(5). However, the City Manager has complete discretion to deny the Administrator's request, and there is no right to appeal the City Manager's refusal to submit a waiver request to the City Council. *Id.* Similarly, the Altman Resolution provides no right to appeal the City Council's rejection of a waiver request. *Id.* As with the Resolution's vagueness problems, these procedural shortcomings make the Resolution unconstitutional. *Cf. FW/ PBS, Inc. v. City of Dallas,* 493 U.S., 215, 227–230, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (requiring speech regulations to contain adequate procedural safeguards); *Wayfield v. Town of Tisbury,* 925 F.Supp. 880, 889 (D.Mass.1996) (holding that town violated library patron's right to due process by suspending library privileges without providing hearing to contest suspension).

23. Under Texas law, "[i]t is generally recognized that governmental or legislative functions of a municipality cannot be delegated to private entities." *Andrews v. Wilson,* 959 S.W.2d 686, 690 (Tex.App. 1998). *See also City of Galveston v. Hill,* 519 S.W.2d 103, 105 (Tex. 1975). "A municipality cannot, by contract or otherwise, transfer control of its governmental functions to another entity, absent specific constitutional authorization." *Andrews,* 959 S.W.2d at 690 (citing *Pittman v. City of Amarillo,* 598 S.W.2d 941, 945 (Tex.Civ.App. 1980); *General Tel. Co. of Southwest v. City of Perryton,* 552 S.W.2d 888, 891 (Tex.Civ.App. 1977)).

24. Through the Altman Resolution, the City Council has unlawfully delegated its proper governmental authority over the selection and removal of Library books to any 300 private citizens who wish to remove a book from the children's area of the Library. Thus, the Altman Resolution constitutes an improper delegation of governmental authority under Texas law.

25. As demonstrated above, the Altman Resolution—on its face and as applied to the Defendants' removal of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's area of the Library—violates Plaintiffs' constitutional right to receive information. It is undisputed that the "[l]oss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury." *Ingebretsen v. Jackson Public Sch. Dist.,* 88 F.3d 274, 280 (5th Cir. 1996) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

26. The constitutional injury that Plaintiffs will suffer as a result of

the continued enforcement of the Altman Resolution—including the continued segregation of the censored Books—far outweighs any possible harm to the Defendants if the Resolution is enjoined and the Books remain in the children's section of the Library. Without a permanent injunction, the Plaintiffs will suffer irreparable injury to their constitutional rights.

27. Injunctive relief will serve the public interest because it will protect the constitutional rights of Plaintiffs and other Wichita Falls Library patrons. The public simply has no interest in effectuating an unconstitutional law. *See, e.g., Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1056 (5th Cir.1997); *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir.1995); *Hyde Park Partners v. Connolly,* 839 F.2d 837, 854 (1st Cir.1988).

### FINAL JUDGMENT

For the reasons stated in this Court's Memorandum Opinion, judgment is entered in favor of the Plaintiffs, enjoining the Defendants from enforcing City Council Resolution No. 16–99 (the "Altman Resolution") because it is unconstitutional. Costs are taxes against the Defendant City of Wichita Falls, Texas.