*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0363P (6th Cir.)
File Name: 03a0363p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT A. NEINAST,
    *Plaintiff-Appellant,*

    *v.*

BOARD OF TRUSTEES OF THE
COLUMBUS METROPOLITAN
LIBRARY; LARRY D. BLACK;
VONZELL L. JOHNSON,
    *Defendants-Appellees.*

No. 02-3482

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00443—Algenon L. Marbley, District Judge.

Submitted: August 1, 2003

Decided and Filed: October 10, 2003

Before: KENNEDY, GILMAN, and GIBBONS, Circuit
Judges.

---

---

## COUNSEL

**ON BRIEF:** Philomena M. Dane, Johnathan E. Sullivan, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, for Appellees. Robert A. Neinast, Pickerington, Ohio, pro se.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Robert A. Neinast, a patron of the Columbus Metropolitan Library (Library) was evicted from the Library as a result of going barefoot. Neinast brought suit against the Board of Trustees of the Columbus Metropolitan Library (Board) and others under 42 U.S.C. § 1983, claiming violations of his rights under the First, Ninth, and Fourteenth Amendments of the United States Constitution, Article I of the Ohio Constitution, and Ohio Revised Code § 3375.40. All parties moved for summary judgment. The district court granted summary judgment in favor of defendants-appellees. For the reasons set forth below, we affirm the judgment of the district court.

### I.

Plaintiff-appellant Neinast, a resident of Pickerington, Ohio, regularly goes barefoot and often uses the Library. Defendant-appellee Board serves as the regulating authority of the Library and is authorized by Ohio Revised Code § 3375.40 to "[m]ake and publish rules for the proper operation and management of the free public library and facilities under its jurisdiction, including rules pertaining to the provision of library services to individuals, corporations, or institutions that are not inhabitants of the county." Defendant-appellee Larry D. Black is the Executive Director

of the Library, and defendant-appellee Vonzell Johnson is the Assistant Manager of Security for the Library. Although the Patron Regulations of the Library (approved by the Board) do not contain a prohibition on using the Library without shoes, the Library's Eviction Procedure (approved by the Executive Director) does provide that patrons not wearing shoes be given a warning and be "asked to leave [the] premises to correct the problem."

On several different occasions between 1997 and 2001, Neinast was asked to leave the Library for failure to comply with the Library's requirement that patrons wear shoes while on its premises. Neinast first was asked to leave the Library for not wearing shoes on September 12, 1997. On November 10, 2000, Neinast again was informed that he would have to wear shoes in order to use the Library's facilities and was asked to leave. On January 23, 2001, Neinast was asked to leave for the same reason. On March 2, 2001, Neinast again entered the Library barefoot, and subsequently was approached by two security officers and taken to the security desk, where one of the officers, acting under the supervision of Johnson, presented Neinast with a one-day eviction from the Library.

After being asked to leave on November 10, 2000, Neinast wrote a letter to Black dated November 16, 2000, and a letter to the Board dated December 11, 2000, complaining of the enforcement of the Eviction Procedure and the procedure's alleged inconsistency with the Patron Regulations. In a response dated December 14, 2000, the Board informed Neinast that Black had "the authority to make such decisions" and that the Board believed that Black "had made the correct one." According to the Library Organization Policy, Black (as the Executive Director) is responsible for "determining internal policies and procedures, . . . public relations, relations with the community and governmental agencies, and the handling of all other matters involved with the operation of the library system."

On January 19, 2001, Neinast wrote another letter expressing his concerns about the prohibition on using the Library without shoes, and on January 30, 2001, Black asked the Franklin County Prosecutor's Office "for the legal reasons that [the Board] can give for requiring its customers to dress appropriately for a public place." In a letter dated February 7, 2001, the prosecutor's office responded that in accordance with *Kreimer v. Bureau of Police of Morristown*, 958 F.2d 1242 (3d Cir. 1992), "the Library may implement reasonable rules for the operation of the Library or the conduct of Library business, including a requirement that patrons wear shoes while in the library."

On March 5, 2001, following his one-day eviction from the Library on March 2, 2001, Neinast sent another letter to Black, the Board, and the prosecutor's office. On March 12, 2001, Black informed Neinast that he had "been made aware that we require our customers to wear shoes while using the Columbus Metropolitan Library facilities" and that he had been "provided a legal opinion . . . stating that the Library has the legal authority to make and enforce such a rule," and concluding that the Library "will not respond to further correspondence on this matter."

On April 3, 2001, Neinast, acting *pro se*, filed a complaint in the Franklin County Court of Common Pleas alleging violations of 42 U.S.C. § 1983 based on deprivations of his First, Ninth, and Fourteenth Amendment rights under the United States Constitution and his rights under Article I of the Ohio Constitution. Defendants-appellees removed this case to the United States District Court for the Southern District of Ohio on May 11, 2001 and filed an answer on May 24, 2001. Neinast filed an amended complaint on June 27, 2001. On July 9, 2001, defendants-appellees filed an answer to the amended complaint. Both parties then filed motions for summary judgment. On March 27, 2002, the district court granted summary judgment in favor of defendants-appellees. Neinast timely filed his notice of appeal on April 25, 2002.

## II.

A district court's grant of a motion for summary judgment is reviewed *de novo*. *See Braithwaite v. The Timken Co.*, 258 F.3d 488 (6th Cir. 2001). Where the parties have filed cross-motions for summary judgment, this court "evaluate[s] each motion on its own merits and view[s] all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). However, an opponent of a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998) (citing *Matsushita*, 475 U.S. at 587).

## A.

Neinast claims that the Board's enforcement of the requirement that patrons of the Library wear shoes deprived him of his right to receive information under the First and Fourteenth Amendments.[1] The district court assumed that

---

[1]At the district court level, Neinast also asserted that walking barefoot constituted speech protected by the First Amendment, that the shoe regulation violates his equal protection rights, and that the individual defendants were not entitled to qualified immunity. The district court found that Neinast's practice of going barefoot in public buildings did not qualify as symbolic speech, that his equal protection rights had not been violated, and that the individual defendants were shielded from liability. *See Neinast v. Bd. of Trs. of Columbus Metro. Library*, 190 F.Supp.2d 1044-46, 1048-49 (S.D.Ohio 2002). On appeal, Neinast does not

Neinast had a First Amendment right of access to the Library, but rejected his claim, finding the Board's requirement that patrons of the Library wear shoes to be "a valid, content-neutral regulation that promotes communication of the written word in a safe and sanitary condition." *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 190 F.Supp.2d 1040, 1044 (S.D.Ohio 2002). The district court concluded that "to the extent that it limits Plaintiff's right of access to speech, the Library's shoe regulation satisfies this intermediate scrutiny." *Id.* Neinast now argues that the presence of feces, semen, blood, and broken glass in or around the library system, as established by incident reports, fails to represent any danger to barefooted patrons. Neinast asserts that "the shoe policy *is* substantially broader than necessary, even if one assumes that the Library's incidents constitute hazards to barefooted persons." Neinast also claims that the Board's claim of a substantial governmental interest in public safety represents "an expansion of the police power beyond its traditional boundaries."

The First Amendment protects the right to receive information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."). This right to receive information "includes the right to some level of access to a public library, the quintessential locus of the receipt of information." *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992); *see also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) ("A library is a mighty resource in the free marketplace of ideas."); *Armstrong v. Dist. of Columbia Pub. Library*, 154 F.Supp.2d 67, 75 (D.D.C. 2001) (noting the existence of "long-standing precedent supporting plaintiff's First Amendment right to receive information and ideas, and this right's nexus with access to public libraries").

---

challenge these conclusions.

For the purposes of First Amendment analysis, the Library is a limited public forum. *Kreimer*, 958 F.2d at 1259; *Sund v. City of Wichita Falls, Texas*, 121 F.Supp.2d 530, 548 (N.D.Tex. 2000); *Mainstream Loudon v. Bd. of Trs. of Loudon County Library*, 24 F.Supp.2d 552, 563 (E.D.Va. 1998). As such, the Library "is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum." *Kreimer*, 958 F.2d at 1262. Traditionally, libraries provide a place for "reading, writing, and quiet contemplation." *Id.* at 1261. Not all aspects of a library involve the right to receive information, however. For example, a library that consisted of a card catalog, a circulation desk, and closed stacks would be perfectly capable of allowing patrons to exercise their right to receive information, but would not be a place where patrons could read, write, and quietly contemplate.

As previously noted, the requirement for our consideration provides for the denial of access to the Library based upon a patron's failure to wear shoes. In *Ward v. Rock Against Racism*, the United States Supreme Court reviewed a regulation in which the government "regulate[d] expression" according to a heightened standard of scrutiny. 491 U.S. 781, 791 (1989). Moreover, the Court held that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

In *Ward*, the Court reviewed use guidelines promulgated by the City of New York that only the City could provide sound equipment and sound technicians for performances given at the Central Park Bandshell. *Id.* at 788. The guidelines

summarized their purpose as "insur[ing] appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone of Sheep Meadow." *Id.* The *Ward* guidelines regulation, albeit content-neutral, restricted the volume of speech, and in so doing, had a direct impact on speech. While the Library regulation at issue in this case is also content-neutral, it does not directly impact the right to receive information. Therefore, applying the heightened scrutiny standard of *Ward* to the Library regulation is not appropriate.

Instead we review the Library regulation under a rational basis standard. *See Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001) (holding that where there has been no infringement of a fundamental right, review under a rational basis standard is appropriate); *Memphis Am. Fed'n of Teachers, Local 2032 v. Bd. of Ed. of Memphis City Sch.*, 534 F.2d 699, 703 (6th Cir. 1976) (same). "The rational basis test requires the court to ensure that the government has employed rational means to further its legitimate interest." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998). Moreover, "[u]nder the rational basis review, a court usually will uphold regulations because 'the state's important regulatory interests are generally sufficient to justify them.'" *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). The Library regulation survives rational basis review because the regulation provides a rational means to further the legitimate government interests of protecting public health and safety and protecting the Library's economic well-being by seeking to prevent tort claims brought by library patrons who were injured because they were barefoot.

**B.**

Even if we were to conclude that heightened scrutiny is appropriate in the instant case, we believe that the Library

regulation would meet this standard. The requirement that patrons of the Library wear shoes is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of information." *Ward*, 491 U.S. at 791.

In *Kreimer*, a homeless man challenged several public library rules regulating patron behavior, one of which provided that:

> Patrons shall not be permitted to enter the building without a shirt or other covering of their upper bodies or without shoes or other footwear. Patrons whose bodily hygiene is offensive so as to constitute a nuisance to other persons shall be required to leave the building.

958 F.2d at 1248. The district court found the rule to be "null and void on [its] face" and enjoined the Library from enforcing the rule, but later modified its order, explaining "that it was not invalidating the rule[] to the extent that [it] required the wearing of shoes or shirts." *Id.* at 1250. The Library appealed, and the Third Circuit reversed the district court. The court noted that the Library "has a significant interest in ensuring that 'all patrons of the [Library] [can] use its facilities *to the maximum extent possible* during its regularly scheduled hours.'" *Id.* at 1264 (emphasis in original). The court explained that the invalidated portion of the rule "prohibits one patron from unreasonably interfering with other patrons' use and enjoyment of the Library" and "further promotes the Library's interest in maintaining its facilities in a sanitary and attractive condition." *Id.* In dicta, the court added that the Library's rules need not "condition exclusion upon actual or imminent disruption." *Id.* The court also suggested that the portion of the rule requiring patrons to wear shoes would pass constitutional muster:

> [I]t seems obvious that the Library may regulate conduct protected under the First Amendment which does not

> actually disrupt the Library. . . . Indeed, the district court itself implicitly acknowledged this point when it modified its order so that it did not invalidate the rule requiring the wearing of shoes, since it can hardly be imagined that a person simply by being barefoot would disrupt the Library.

*Id.* at 1263 n.25.

In this case, Neinast argues that he was "using the Library for its intended purpose when he was asked to leave, and that his bare feet did not disrupt the library." As the Third Circuit observed in *Kreimer*, however, "the Library is not confined to prohibiting behavior that is actually disruptive." 958 F.2d at 1264 n.28. Here, according to the Board, the requirement that patrons of the Library wear shoes was promulgated "in order to protect the safety of Library patrons from documented hazards within the Library – including blood, feces, semen and broken glass that have, on occasion, been found there." Specifically, in an affidavit dated August 2, 2001, Black stated that he approved the requirement that patrons of the Library wear shoes in order to protect "the health and safety of Library patrons, who may be harmed in the Library if allowed to enter barefoot" and "the economic well-being of the Library, by averting tort claims and litigation expenses stemming from potential claims made by barefoot patrons who could have suffered injuries that shoes could have

prevented."[2]    These concerns qualify as significant governmental interests.

"Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, . . . matter[s] of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quotations and citations omitted). Here, the Board has provided incident reports documenting various hazards to barefoot patrons, including the presence of feces on the floor of the restroom and in the reading area (JA 133, 153, 163, 176, 197, 212, 250, 252, 254, 256, 257), vomit on the floor of the restroom and in the children's area (JA 170, 224), broken ceiling tiles on the floor of the restroom (JA 134), splintered chair pieces in the children's area (JA 140), drops of blood on the floor of the restroom (JA 184), urine in the elevator, on the floor of the bathroom, on a chair in the reading area, and

---

[2]Neinast argues that the Board's stated interests are not genuine and notes that the Eviction Guidelines refer only to "[i]nappropriate dress," while making no mention of health and safety or economic well-being. There is some evidence in the record suggesting that the Board had an interest in requiring proper attire. As previously mentioned, in a letter to the Franklin County Prosecutor's Office dated January 30, 2001, Black requested "the legal reasons that [the Library] can give for requiring its customers to dress appropriately for a public place." As the Supreme Court has noted, in the intermediate scrutiny context the state is expected "to give its real reasons for passing an ordinance." *Watchtower Bible and Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 170 (2002) (Breyer, J., concurring). However, the Court also explained that the state may "rely on the rationale in the courts below," as long as the reviewing court itself "does not supply reasons." *Id.* at 169-70. In this case, the interests advanced by the Board in the district court and on appeal are reflected in Black's affidavit. Neither the district court nor this court manufactured these reasons. Consequently, consideration of the Board's stated interests in health and safety and economic well-being is appropriate.

on the floor of the reading area (JA 161, 165, 168, 176, 266, 276, 291), and broken glass in the lobby (JA 185). The Board also has submitted reports describing incidents where a patron scraped his arm on a staple in the carpet in the meeting room, causing bleeding (JA 260), where a patron's foot went into a gap between the bottom of a door and the ground, causing a cut (JA 297), and where a barefoot patron's toe was caught in a door, causing bleeding and requiring the assistance of paramedics (JA 301). The Board thus has demonstrated the existence of a significant health and safety risk to individual barefoot patrons.

Having established the existence of a significant risk of harm to individual barefoot patrons, this court next must determine whether a significant cost to the general public also has been shown. "To justify the state in . . . interposing its authority in behalf of the public, it must appear – First, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.'" *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights, Ohio*, 209 F.3d 626, 643 (6th Cir. 2000) (quoting *Lawton v. Steele*, 152 U.S. 133, 137 (1894)). Courts consistently have upheld statutes primarily directed at preventing injury to an individual on the basis of the impact upon the general public. *See, e.g., Picou v. Gillum*, 874 F.2d 1519, 1522 (11th Cir. 1989) (noting that although the "primary aim" of a state statute requiring motorcycle riders to wear protective headgear "is prevention of unnecessary injury to the cyclist himself," the "costs of this injury may be borne by the public").

Here, the Board's stated rationale for its requirement that patrons of the Library wear shoes is not only to protect individual barefoot patrons from harm to themselves, but also to protect the general public "by averting tort claims and litigation expenses stemming from potential claims by barefoot patrons who could have suffered injuries that shoes

could have prevented." Avoiding the expense of litigation is a legitimate governmental interest. *See Listle v. Milwaukee County*, 138 F.3d 1155, 1160 (7th Cir. 1998). Injuries suffered by individual barefoot patrons of the Library also impose broader societal costs. In this case, the Board has presented evidence that on at least one occasion paramedics were summoned to assist a barefoot patron who suffered an injury to her feet while in the Library. Describing the costs borne by the general public as a result of the failure of motorcyclists to wear helmets, the Eleventh Circuit explained that "[s]tate and local governments provide police and ambulance services, and the injured cyclist may be hospitalized at public expense." *Picou*, 874 F.2d at 1522. Similarly, in this case barefoot patrons of the Library who are injured as a result of the hazards previously described impose costs on the general public. For these reasons, we conclude that the Board has demonstrated a significant governmental interest in requiring that patrons of the Library wear shoes.

In addition, the Board's requirement that patrons of the Library wear shoes is sufficiently narrow. In order to satisfy the "narrowly tailored" requirement, a regulation "need not be the least restrictive or least intrusive means" of serving the government's legitimate, content-neutral interests. *Ward*, 491 U.S. at 798. All that is required is "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) (quotation omitted). Neinast argues that the requirement that patrons of the Library wear shoes is not narrowly tailored because although the documented hazards occurred "almost exclusively in the restrooms or outside the Library building," the challenged provision requires that patrons wear shoes "everywhere in the Library buildings, even amongst the books." Close scrutiny of the record, however, reveals that hazards to barefoot patrons can be found throughout the Library buildings. Specifically, the Board has provided evidence that on one

occasion feces was found among the books (JA 212), that on one occasion vomit was found in the children's area (JA 224), that on one occasion splintered pieces of a chair were found in the children's area (JA 140), that on three occasions urine was found in the elevator and in the reading area (JA 161, 266, 291), that on one occasion broken glass was found in the lobby (JA 185), and that on one occasion a staple was found in the carpet of the reading room (JA 260). In light of the fact that the Board has documented the presence of hazards throughout the Library buildings, we find the requirement that patrons wear shoes to be narrowly tailored.

Finally, the requirement that patrons wear shoes leaves open alternative channels for communication. "[S]o long as a patron complies with the rules, he or she may use the Library's facilities." *Kreimer*, 958 F.2d at 1264. In this case, as long as Neinast wears shoes, he may receive information in the Library. Consequently, Neinast may be prohibited from going barefoot while in the limited public forum of the Library.

## C.

Neinast asserts that the Board's enforcement of the requirement that patrons of the Library wear shoes deprived him of his right of personal appearance under the First, Ninth, and Fourteenth Amendments. Specifically, Neinast argues that the district court erred by failing "to recognize, as a matter of law, the existence of the right of personal appearance, either as a fundamental right or as a protected liberty interest." Neinast claims that while rational basis review may be appropriate in situations involving government employees, the instant case requires strict scrutiny, since it involves "a member of the general public."

In *Kelley v. Johnson*, 425 U.S. 238 (1976), the Supreme Court observed that "whether the citizenry at large has some sort of 'liberty' interest within the Fourteenth Amendment in

matters of personal appearance is a question on which this Court's cases offer little, if any, guidance." *Kelley*, 425 U.S. at 244. Although the Court went on to assume, for the purposes of the case, that a liberty interest existed, it did not affirmatively acknowledge such an interest. *Id.* However, a considerable body of precedent suggests the existence of a liberty interest in one's personal appearance.

In general, "[l]iberty under law extends to the full range of conduct which the individual is free to pursue." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see also Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting) (describing liberty as "a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints"). Other circuits specifically have found the existence of a liberty interest in personal appearance. *See DeWeese v. Town of Palm Beach*, 812 F.2d 1365, 1367 (11th Cir. 1987) (prohibiting shirtless male jogger unreasonable); *Domico v. Rapides Parish Sch. Bd.*, 675 F.2d 100, 101 (5th Cir.1982) (noting that "there is a constitutional liberty interest in choosing how to wear one's hair"). "[S]ince *Kelley*, the nation's courts have assumed or found [a liberty interest] in a veritable fashion show of different factual scenarios." *Zalewska v. County of Sullivan, New York*, 316 F.3d 314, 321 (2d Cir. 2003).

Assuming the existence of a liberty interest in personal appearance, we must next determine whether the Board unconstitutionally infringed upon Neinast's liberty interest by mandating that he wear shoes in the Library. The Sixth Circuit previously has held that personal appearance is not a fundamental right. *See Gfell v. Rickelman*, 441 F.2d 444, 446 (6th Cir. 1971) ("We are unable to agree with some courts that the freedom of choosing one's hair style is a fundamental right."). Since the Board's requirement that patrons of the Library wear shoes does not implicate a fundamental right, it is subject to rational basis scrutiny. *See DeWeese*, 812 F.2d at 1367; *see also Domico*, 675 F.2d at 102; *Rathert v. Vill. of*

*Peotone*, 903 F.2d 510, 514 (7th Cir. 1990) (reviewing village regulation prohibiting off duty police officers from wearing ear studs under rational basis test).

"Even foolish and misdirected provisions are generally valid if subject only to rational basis review." *Craigmiles v. Giles*, 312 F.3d 220, 223-24 (6th Cir. 2002). Consequently, this court will not overturn the Board's requirement that patrons of the Library wear shoes unless the varying treatment of barefoot persons "is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [Board's] actions were irrational." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000) (quotation omitted). In order to prevail, Neinast must negate "every conceivable basis that might support" the requirement that patrons wear shoes. *Craigmiles*, 312 F.3d at 224 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Here, as previously discussed, the Board has made the reasonable determination that the requirement that patrons of the Library wear shoes is necessary to protect both "the health and safety of Library patrons, who may be harmed in the Library if allowed to enter barefoot," and "the economic well-being of the Library, by averting tort claims and litigation expenses stemming from potential claims made by barefoot patrons who could have suffered injuries that shoes could have prevented." Consequently, the Board's requirement that patrons of the Library wear shoes satisfies rational basis review.

### D.

Neinast claims that Black presently is "enforcing a barefoot policy that is not authorized by State Law" or by the Board, and that Johnson "enforced that barefoot policy in a manner sanctioned by neither State Law, nor the Eviction Procedure," thereby depriving Neinast of procedural due process. These claims lack merit.

First, Neinast cannot base his procedural due process claim on the Board's allegedly "improper adoption of a rule of general applicability." *Reichelt v. Gates*, 967 F.2d 590, 1992 WL 127057, at *2 (9th Cir. June 11, 1992) (citing *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 244-46 (1973)). "Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard." *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991). Since the requirement that all patrons of the Library wear shoes is of general applicability, Neinast's procedural due process rights have not been violated with respect to the provision's adoption.

Neinast admits that the Board "properly promulgated their Patron Regulations," but observes that the Patron Regulations themselves contain no express requirement that patrons of the Library wear shoes. However, the issue of whether the Board's delegation of authority to the Executive Director to establish the Eviction Procedures was proper is a matter of state law. Section 1983, upon which Neinast bases his claim, authorizes courts to redress violations of "rights, privileges, or immunities secured by the Constitution and [federal] laws" that occur under color of state law. "The statute is thus limited to deprivations of federal statutory and constitutional rights. It does not cover official conduct that allegedly violates state law." *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (citing *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). Neinast concedes that the Board's delegation of authority to Black "regarding internal polices and procedures" was proper, but argues that Black "was not granted the authority to create and enforce an *external regulation*."[3] Neinast's claim turns upon a question

---

[3] Neinast mischaracterizes the extent of the authority granted to Black by the Board. As previously noted, Black was not merely limited to "internal policies and procedures," but also was responsible for "public

of state law – namely, the amount of rulemaking authority the Board properly can delegate to its Executive Director under Ohio Revised Code § 3375.40 – and thus falls outside the scope of § 1983.

With regard to his second claim, Neinast argues that the procedures employed by Johnson when serving Neinast with a one-day eviction from the Library departed from the Eviction Procedure, thereby depriving him of procedural due process. The Eviction Procedure states that patrons wearing "inappropriate dress, to include but not be limited to: no shirts and no shoes" are to be "asked to leave [the] premises to correct the problem." After violating this provision on March 2, 2001, however, Neinast was served with a one-day eviction for a violation described as "improper dress/staff harassment."

While "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), the fact that Johnson did not follow the Eviction Procedure, standing alone, does not establish a denial of due process. "Due process of law guarantees 'no particular form of procedure; it protects substantial rights.'" *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610 (1974) (quoting *NLRB v. Mackay Co.*, 304 U.S. 333, 351 (1938)). It is unclear what level of process Neinast claims he was entitled to receive. The Supreme Court has observed that "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). At a minimum, however, "'[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Goss v. Lopez*, 419 U.S.

---

relations, relations with the community, . . . and the handling of all other matters involved with the operation of the library system."

565, 579 (1975) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1864)).  Here, immediately prior to Neinast's eviction on March 2, 2001, Chris Taylor (another employee of the Library) and Johnson discussed the eviction procedure with Neinast.  Neinast was notified of the charges against him by Johnson, who stated that "he was harassing the staff by continuing to come in without his shoes on."  Neinast expressed his disagreement and "reminded [Taylor and Johnson] that [the Library's] procedure only states that [the Library] may ask him to leave."  Neinast thus was provided with notice of the charges against him and "'an opportunity to present his side of the story.'"  *Boals v. Gray*, 775 F.2d 686, 690 (6th Cir. 1985) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)).  Regardless of what procedure is generally due when a patron of a public library contests charges giving rise to a proposed short-term eviction, under the particular facts of this case the procedure by which Neinast was evicted was constitutional.  Consequently, summary judgment for defendants-appellees was proper.

## III.

For all of the foregoing reasons, we affirm the judgment of the district court.