*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0339p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

S.H.A.R.K.; STEPHEN HINDI,

    *Plaintiffs-Appellants,*

  *v.*

METRO PARKS SERVING SUMMIT COUNTY; DAVE
RANKIN; JUSTIN SIMON; WHITE BUFFALO, INC.;
ANTHONY DeNICOLA; JOHN DOE,

    *Defendants-Appellees.*

No. 06-4009

>

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 04-02329—John R. Adams, District Judge.

Argued: June 1, 2007

Decided and Filed: August 24, 2007

Before: MOORE and GRIFFIN, Circuit Judges; McKINLEY, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Kenneth D. Myers, Cleveland, Ohio, for Appellants. Nick Tomino, TOMINO &
LATCHNEY, Medina, Ohio, Mark J. Scarpitti, OLDHAM & DOWLING, Akron, Ohio, John T.
McLandrich, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellees. **ON BRIEF:**
Kenneth D. Myers, Cleveland, Ohio, for Appellants. Nick Tomino, TOMINO & LATCHNEY,
Medina, Ohio, Mark J. Scarpitti, William D. Dowling, OLDHAM & DOWLING, Akron, Ohio, John
T. McLandrich, Frank H. Scialdone, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, John L.
Reyes, BUCKINGHAM, DOOLITTLE & BURROUGHS, Akron, Ohio, for Appellees.

———————————

## OPINION

———————————

  KAREN NELSON MOORE, Circuit Judge. Plaintiffs-Appellants S.H.A.R.K. (Showing
Animals Respect and Kindness) and Stephen Hindi ("Hindi") (collectively "the plaintiffs") appeal
the district court's order granting summary judgment to the Defendants-Appellees Metro Parks
Serving Summit County ("Metro Parks"); Dave Rankin ("Rankin"); Justin Simon ("Simon"); White

———————————

[*] The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky,
sitting by designation.

1

Buffalo, Inc. ("White Buffalo"); Anthony DeNicola ("DeNicola"); and John Doe (collectively "the defendants"). The plaintiffs sued under 42 U.S.C. § 1983, the Privacy Protection Act, 42 U.S.C. § 2000aa *et seq.*, and state-law tort, alleging that the defendants violated their First Amendment rights. Although we disagree with the district court's analysis, its decision to grant summary judgment to the defendants was correct; accordingly, we **AFFIRM**.

## I. BACKGROUND

S.H.A.R.K. is an Illinois not-for-profit corporation created to expose inhumane treatment of animals. Hindi is S.H.A.R.K.'s founder and president. Metro Parks is a governmental entity operating public parklands. Rankin and Simon are park rangers employed by Metro Parks. DeNicola is the president of White Buffalo, Inc., a wildlife research and management organization that provides deer-culling services. DeNicola provides sharpshooting training to those who hire White Buffalo.

In November 2003, Metro Parks contracted with White Buffalo and DeNicola to assist in a planned deer-culling operation. The goal was to kill approximately two-hundred deer in four separate parks within Metro Parks's system over a ten-day period. DeNicola trained the participating park rangers so that they would be qualified by the following year to kill deer without DeNicola. A park was closed during the times when the culling was scheduled due to public-safety concerns.

DeNicola was in charge of the rangers for training purposes. Simon testified that, during the times he was detailed to DeNicola, he was to follow DeNicola's directions. Rankin also stated that, during deer culling, DeNicola was in charge of him and the other park rangers. However, Metro Parks official Mike Johnson ("Johnson") was responsible for coordinating the entire operation. On the culling nights, DeNicola answered to Johnson.

Meanwhile, the plaintiffs had plans of their own. On or about February 22, 2004, the plaintiffs entered the parks during daytime hours (while the parks were open to the public) and placed cameras in various areas that they believed to be bait sites. The plaintiffs placed the cameras on the ground in bags. Each bag was covered by leaves, and a wire ran from the bag up the side of a tree. A small camera lens was attached to the bark of the tree with a small, screw-type mount or bracket. The cameras were pre-programmed to record during set hours. The plaintiffs intended to record the entire ten-day deer cull, then select video to share with the news. Each day, Hindi went back to the camera locations to change out the cameras' digital imaging and to obtain the images from the previous night.

On February 29, 2004, during the course of the deer-culling operation, Simon discovered one of the cameras on a tree located several feet from a public road. Simon contacted Eric Fitch ("Fitch"), a Metro Parks supervisor, who came to the site and removed the camera. The rangers were instructed to stop culling for the night; along with DeNicola, they searched for other cameras. In all, six cameras were found that night.[1] None of the cameras and equipment bore information identifying the owners. The rangers took the cameras and equipment to the ranger station where they were treated as "found property." Joint Appendix ("J.A.") at144, 845 (Dickson Aff. at ¶ 4; Simon Dep. at 55).

The next day, March 1, Rankin and Simon continued to look for, but did not find any, cameras. In accord with Fitch's instruction, Rankin and Simon returned to the ranger station to

---

[1] After the cameras and equipment were discovered, the plaintiffs released to the media the footage they had earlier acquired. The footage was broadcast on the local television news.

inventory the cameras and equipment found the previous night. According to DeNicola, Rankin called DeNicola and told him that he was concerned that the cameras may have captured images of Rankin's personal vehicle which Rankin had used to search for cameras. Rankin asked DeNicola to come to the ranger station to see if he could operate the camera. In contrast, Simon and Rankin both testified that neither of them asked DeNicola to come to the ranger station.

According to DeNicola, Rankin was concerned about the video images because Rankin's license plate was visible and neither Rankin nor Metro Parks would be able to control the release of these images, because the cameras were "found property." J.A. at 563 (DeNicola Dep. at 81). DeNicola testified that Rankin asked if DeNicola could erase the images and that DeNicola responded by deleting the images on the camera. When asked if Rankin knew what DeNicola was doing when the latter deleted the images, DeNicola replied, "It was apparent at the time that it was addressing his concerns." J.A. at 564 (DeNicola Dep. at 82).

Rankin denied telling DeNicola to erase the images; Rankin instead stated that DeNicola deleted the images completely of his own accord. However, Rankin and Simon both admitted that they did not try to stop DeNicola from deleting the images. Simon acknowledged that the camera equipment was in the custody and control of both Rankin and Simon himself. Moreover, Simon admitted that DeNicola would not have had access to the cameras without Rankin and Simon allowing him into the area where the cameras were located. No supervisors or officials at Metro Parks approved or authorized the erasure of the images on the video cameras. That same day of the erasures, Hindi contacted Metro Parks and claimed ownership of the cameras and equipment.

On March 2, 2004, Metro Parks contacted local prosecutors in Cuyahoga Falls and Akron about the possibility of filing criminal charges against the plaintiffs. Metro Parks disciplined Simon and Rankin for "serious misconduct," for allowing DeNicola to delete the images, J.A. at 359, 370 (Ranger Simon Report; Ranger Rankin Report), and contacted the prosecutors' offices in Cuyahoga Falls and Akron to determine whether to bring criminal charges against Simon, Rankin, and DeNicola. The prosecutors' offices decided not to bring any criminal charges against any of the plaintiffs or defendants. Metro Parks returned the cameras and equipment to Hindi on March 30, 2004.

The plaintiffs sued the defendants in U.S. district court under 42 U.S.C. § 1983, 42 U.S.C. § 2000aa *et seq.*, and state law. The defendants filed motions for summary judgment. The district court granted the defendants summary judgment on the federal claims and, declining to exercise supplemental jurisdiction, dismissed the state-law claims without prejudice. This appeal follows; we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's order granting summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); FED. R. CIV. P. 56(c).

**B. First Amendment Claims Under 42 U.S.C. § 1983**

   **1. Applicable Test**

          The parties make all of their First Amendment arguments under the analytical construct set forth in *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005). The district court also analyzed this case under *Parks*, presumably because the parties agreed that it was the applicable test. However, we believe that the *Parks* test is inapplicable to the case at bar.

          In *Parks*, a freedom of expression case, we set forth a three-part test for determining whether the government has violated one's free-speech rights: (1) we ask whether the speech is protected under the First Amendment; (2) if so, using the public-forum doctrine, we ascertain whether the applicable forum is public or nonpublic; and (3) applying the appropriate standard for the forum, we ask whether the government's prohibition on speech passes muster under the First Amendment. *Id*.

          The case before us is about access to information as opposed to the right to expression. Although access cases are rooted in First Amendment principles, they have developed along distinctly different lines than have freedom of expression cases. *See, e.g.*, *Houchins v. KQED, Inc.*, 438 U.S. 1, 9-10 (1978) (setting forth general principles regarding access to information under the First Amendment); *Pell v. Procunier*, 417 U.S. 817, 834-35 (1974) (same); *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (same). *See also D'Amario v. Providence Civic Ctr. Auth.*, 639 F. Supp. 1538, 1543 n.4 (D. R.I. 1986), *aff'd without opinion*, 815 F.2d 692 (1st Cir. 1987) (recognizing that access cases require a different analytical approach than do expression cases). "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684. Further, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins*, 438 U.S. at 15. Importantly, however, "[t]here is an undoubted right to gather news 'from any source by means within the law. . . .'" *Id*. at 11 (quoting *Branzburg*, 408 U.S. at 681-82).

          Although the Supreme Court has established general principles with respect to access claims, what is missing from these cases is a clearly defined framework in which to analyze these claims.[2] We find *D'Amario*, 639 F. Supp. 1538, instructive. In *D'Amario*, the plaintiff-photographer challenged the defendant's no-photography rule. The *D'Amario* court synthesized the Supreme Court case law into the following test:

                 The rule which emerges from this caselaw is reasonably clear. Although the press cannot command access wherever, whenever, and however it pleases, neither can government arbitrarily shroud genuinely newsworthy events in secrecy. Members of the press, to their own behoof and as representatives of the public, have some (limited) claim to access when government attempts selectively to delimit the audience (or when government cooperates in enforcing such restrictions). In such circumstances, the state's rulemaking power is not absolute: if the first amendment is to retain a reasonable degree of vitality, the limitations upon access must serve a legitimate governmental purpose, must be rationally related to the accomplishment

---

          [2] While the Supreme Court has developed a framework for analyzing access cases dealing with the special issue of access to judicial proceedings, *see United States v. Miami Univ.*, 294 F.3d 797, 821 (6th Cir. 2002) (explaining the framework), such a framework is missing in access cases outside of the judicial-proceeding context. Because the case law discussing access to judicial proceedings is based on the unique issues that arise in that context, *see id*. at 820-21, this framework is inapplicable to the case at bar.

of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access.

*Id.* at 1543 (footnote omitted). The foregoing test recognizes that the government cannot use the fact that it has made a rule as an absolute shield against access.

With *D'Amario* as our background, we analyze access cases in the following manner: The overarching question is whether the plaintiffs' news-gathering efforts were "within the law." *Houchins*, 438 U.S. at 11 (quoting *Branzburg*, 408 U.S. at 681). Stated differently, the question is whether the plaintiffs had a lawful right of access to the information. If the plaintiffs did have a lawful right of access, then the government violates the First Amendment when it blockades access. The lawful-right-of-access inquiry would be a circular endeavor if we merely determined that there was a rule prohibiting access and then stopped there. Instead, we must determine whether the rule blocking access is, itself, constitutional.

First, we ask what rule the government is invoking that prohibits the plaintiffs from access to information, and whether that rule "selectively [] delimit[s] the audience." *D'Amario*, 639 F. Supp. at 1543. *Cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994) (Content-based restrictions create "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion. These restrictions 'rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" (alteration in original) (quoting *Simon & Schuster, Inc. v. Members of State Crime Victims Bd.,* 502 U.S. 105, 116 (1991))).

Second, we inquire into the government's stated interest for invoking the rule. Third, we apply the applicable test to determine whether the government's stated interest is sufficiently related to the means of accomplishing that interest: if the rule does not selectively delimit the audience, we uphold the restriction if it is reasonably related to the government's interest; if the rule does selectively delimit the audience, a stricter level of scrutiny will apply.[3]

In the case at bar, the plaintiffs argue that the defendants violated the First Amendment by committing two distinct acts: removing the cameras and deleting the images on the cameras. As each act involves different facts and different justifications, we examine each separately.

### 2. Removing the Cameras

The plaintiffs argue that they did not violate any laws by placing the cameras in the parks to record the deer-culling activity, and that, by removing the cameras, the defendants violated their First Amendment right to access the information. Metro Parks invoked four different rules which could arguably justify removing the plaintiffs' cameras. Each justification is analyzed below.

### a. Park Closed to Public During Deer Culling

Metro Parks argues that the plaintiffs had no lawful right of access to video record the deer culling because the parks were closed to the public during the deer-culling operation. Metro Parks Br. at 14. Under § 13 of Metro Parks's Rules and Regulations, "[n]o person shall enter or remain

---

[3] Our decision in *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585 (6th Cir. 2003), is consistent with this framework. *Neinast* involved a shoeless patron's challenge to a mandatory-shoe rule of a city public library. We held that the regulation was content-neutral, did not directly impact the right to receive information, and satisfied rational-basis review because it protected public health and safety and also protected the library's economic well-being.

on the land or premises of the Park District at any time when the parks are not designated as open for use . . . ." J.A. at 152 (Rules and Regs.). This rule does not selectively delimit the audience.

We next ask why Metro Parks closed the parks to the public during the deer-culling operation. Metro Parks asserts that the rule was enacted out of safety concerns, because the operation involved the use of high-powered rifles.[4]

The next question is whether the government's interest reasonably relates to the rule. None of the plaintiffs were physically in the park during the deer culling, and the presence of video cameras did not reasonably relate to the safety concerns behind the parks' closure. There is no dispute that the plaintiffs placed the cameras in the parks while the parks were open to the public. Accordingly, there is no nexus between why the parks were closed and why the defendants removed the cameras. Metro Parks argues that when the defendants first found the cameras they did not know if people were in the parks, and therefore, they had to stop culling operations for the night. But, even assuming the truth of this claim, it still fails to explain why the defendants would need to remove the cameras.[5]

Because the reason for the park-closure rule was completely unrelated to the type of access sought by the plaintiffs when they sought to video record the deer-culling operation, the park-closure rule cannot form the basis for blocking access to the information sought by the plaintiffs. The district court relied on the park-closure rule in granting summary judgment to the defendants with respect to removing the cameras. Although we ultimately affirm the district court's judgment, we do so on grounds different from the district court.

### b. Areas Restricted for Public Use

The next rule invoked by the defendants as a justification for removing the cameras is § 8.8 of Metro Parks's Rules and Regulations: "No portion of the Park shall be used for purpose of way, except drives, roadways, paths, walks and trails established for such purpose; . . . ." J.A. at 152 (Rules and Regs.). According to Metro Parks, the cameras were installed on trees outside of areas designated for Metro Parks public use. This rule does not selectively delimit the audience. Because the parties crafted their arguments under the *Parks* analysis, Metro Parks did not articulate a justification for invoking this rule. Accordingly, we cannot ascertain whether the rule is reasonably related to Metro Parks's interest.

### c. Prohibition on Disturbing Trees

The third rule invoked by Metro Parks as a justification for removing and confiscating the cameras is § 1 of Metro Parks's Rules and Regulations: "No person shall injure, deface or disturb any part of the Park nor any building, sign, equipment or other property found therein; nor shall any tree, flower, shrub, rock or other mineral be removed, injured or destroyed." J.A. at 151 (Rules and Regs.). This rule does not selectively delimit the audience.

---

[4] Rankin asserts that another reason for the rule was to protect the identities of the shooters. However, as Metro Parks is the party that enacted the rule and it does not allege protection of identities as a reason for the rule, we do not credit Rankin's assertion and need only address the safety rationale.

[5] White Buffalo and DeNicola also argue that if the plaintiffs had no right to be physically present, they did "not have a greater right to secretly record the images." White Buffalo and DeNicola Br. at 33. White Buffalo and DeNicola fail to explain why the right to record the images is somehow greater than the right to be physically present.

Metro Parks argues that it was justified in removing the cameras under this rule in order to protect the well-being of the trees to which the cameras were affixed. There is a reasonable relationship between Metro Parks's decision to take down the cameras and its concern that the cameras could harm the trees. The plaintiffs argue that the defendants have not alleged that any trees were, *in fact*, damaged, only that trees *could* have been damaged. But Metro Parks need not show that there was actual damage before taking down the cameras pursuant to § 1 of the Rules and Regulations—taking down the cameras was a reasonable step in light of Metro Parks's concern about protecting trees. Accordingly, the defendants did not violate the First Amendment when they removed the cameras because they were acting pursuant to a rule that did not selectively delimit the audience and was reasonably related to the legitimate concern of protecting trees.

### d. Found-Property Policy

Finally, Metro Parks asserts that removing the cameras was justified pursuant to Metro Parks's policy with respect to found property. According to the Found-Property policy, "[a]ll articles found by or turned in to a Metro Park employee by a park patron will be turned in to the Area Manager or designated supervisor immediately for safekeeping." J.A. at 146 (Found-Property Policy).

This policy does not selectively delimit the audience. Further, the policy serves the legitimate purpose "to provide a uniform method of receiving, safeguarding, and disposing of found property." *Id.* After finding the cameras, the defendants acted in accordance with Metro Parks's policy by removing and inventorying the cameras as found property. The defendants' actions were reasonably related to the policy's purpose of maintaining a uniform method addressing found property. The defendants did not violate the First Amendment when they removed the cameras because they were acting pursuant to a policy that did not selectively delimit the audience and that was reasonably related to Metro Parks's stated interest.

### e. Conclusion

Metro Parks's prohibition on disturbing trees and its policy for handling found property each provide a basis justifying its removing the plaintiffs' cameras. Because the defendants did not violate the plaintiffs' First Amendment rights by removing the cameras, the district court did not err in granting the defendants summary judgment on this part of the plaintiffs' § 1983 claim. We turn now to examine the plaintiffs' § 1983 claim insofar as it pertains to the erasure of the video-recorded images.

### 3. Erasure of Tapes

The issue of whether erasing the video images violated the plaintiffs' First Amendment right requires analysis of three separate questions. First, we analyze whether Metro Parks may be liable for the actions of Rankin, Simon, and DeNicola. Second, we inquire whether Rankin and Simon may be held liable when they were sued in their official capacities only. Third, we ask whether DeNicola and White Buffalo were liable as state actors. Because we answer each of these questions in the negative, the plaintiffs cannot prevail on this part of their § 1983 claim, and the district court was correct in granting summary judgment in favor of the defendants.

### a. As a Matter of Law, Metro Parks Cannot Be Held Liable for the Erasure of the Tapes.

"In order to prevail on a § 1983 claim, [the] [p]laintiffs must demonstrate that [the] [d]efendant[s] deprived them of their 'rights, privileges, or immunities secured by the Constitution' under color of state law." *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007)

(quoting 42 U.S.C. § 1983).  For a governmental entity to be liable under 42 U.S. § 1983, it must be the "moving force behind the deprivation," such that the "entity's policy or custom . . . played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal quotation marks omitted).

Although there are conflicting accounts as to how DeNicola ended up at the ranger station that day, all parties agree that DeNicola erased the tapes, and that Rankin and Simon did nothing to stop him.  No one in this case has asserted that Metro Parks was aware that the three men were erasing the tapes, or that Metro Parks had a policy or custom that would condone such action.

In fact, after Metro Parks found out what had happened, it suspended Rankin and Simon for two days without pay because they "failed to secure and protect the integrity of found property that was collected."  J.A. at 149, 150 (Ltr. to Simon; Ltr. to Rankin).  The plaintiffs have made no argument that the tapes were erased pursuant to any of Metro Parks's policies or customs. Accordingly, even if the actions of Rankin, Simon, and DeNicola violated the First Amendment, Metro Parks could not be liable, as a matter of law, for their actions under § 1983, and the district court did not err in granting summary judgment in Metro Parks's favor.

### b.   As a Matter of Law, Rankin and Simon Cannot be Held Liable for the Erasure of the Tapes, Because They Were Sued in Their Official Capacities Only.

The plaintiffs sued Rankin and Simon in their official capacities only.  When an official is sued in his or her official capacity under § 1983, "the [governmental] entity's policy or custom must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166 (internal quotation marks omitted).  Because the plaintiffs did not allege that Metro Parks's policy or custom played any part in why the tapes were erased, the plaintiffs cannot prevail, as a matter of law, in a § 1983 claim against Rankin or Simon in their official capacities.  Accordingly, the district court was correct in granting summary judgment in Rankin and Simon's favor.

### c.   As a Matter of Law, DeNicola and White Buffalo Cannot be Held Liable for the Erasure of the Tapes, Because They Are Not State Actors.

Because DeNicola is not a government employee and White Buffalo is not a government entity, we must determine whether they can be held liable under 42 U.S.C. § 1983.  "First and Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action and [] a private entity acting on its own cannot deprive a citizen of First Amendment rights." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000).  On the other hand, "a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state." *Id*.

Although the state-action analysis is a normative and fact-bound endeavor, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001), we utilize three tests to assist us in our inquiry. *Lansing*, 202 F.3d at 828-30.  These tests are the public-function test, the state-compulsion test, and the nexus test. *Id*.  The plaintiffs argue that, even though DeNicola is not a government employee and White Buffalo is not a government entity, their actions so approximated state action that they are subject to liability under § 1983.  We conclude that neither DeNicola or White Buffalo qualify as state actors under any of the state-action formulations.

"The public function test requires that 'the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain.'" *Id*.

at 828 (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). Having neglected to present an argument that deer-culling satisfies the requirements of the public-function test, plaintiffs have forfeited this argument. *See United States v. Reed*, 167 F.3d 984, 993 (6th Cir.), *cert. denied*, 528 U.S. 897 (1999) (stating that a party forfeits an argument on appeal when it is mentioned in only a cursory manner with no further development).

"The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state."[6] *Lansing*, 202 F.3d at 829 (internal quotation marks omitted). Here the plaintiffs point to the "encouragement" Rankin and Simon gave to DeNicola to delete the images on the tapes. Although there is a fact dispute as to how DeNicola arrived at the ranger station, the version most favorable to the plaintiffs was that Rankin and Simon asked him to come. At most, Rankin and Simon asked if DeNicola knew how to erase the tapes, and they did not stop him when he began to do so. Metro Parks had no knowledge of this activity at the time that it was occurring. On this record, there is no coercion; DeNicola made a free-will choice to erase the images. Likewise, to the extent that Rankin and Simon (two rogue rangers) "encouraged" him, this is not the type of significant encouragement which would turn DeNicola's choice to delete the tapes into that of government action.

"Under the nexus test, 'the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.'" *Id*. at 830 (quoting *Wolotsky*, 960 F.2d at 1335). In *Brentwood*, the Supreme Court found state action based on the "pervasive entwinement," between the private actor and the state such that there was "no offsetting reason to see the association's acts in any other way." *Brentwood*, 531 U.S. at 291. Here the relationship between Metro Parks and White Buffalo was a one-time contractual relationship whereby White Buffalo provided deer-culling training to Metro Parks rangers. There was no on-going relationship. Despite the plaintiffs' argument to the contrary, this is far from "a complete [e]ntwinement of a private entity with a public entity." Pls. Br. at 53. The relationship between White Buffalo and Metro Parks is easily understood as two separate entities entering into a contractual arrangement to provide and receive a one-time service. Accordingly, DeNicola and White Buffalo are not state actors pursuant to the nexus test.

### d. Conclusion

As a matter of law, the plaintiffs cannot prevail against any of the defendants on a First Amendment claim stemming from the erasure of the images from the camera. The plaintiffs' action against Metro Parks fails because the plaintiffs have not pointed to any custom or policy which would have played a part in the decision to erase the tapes. The plaintiffs' action against Rankin and Simon fails because Rankin and Simon were sued in their official capacities only; because the action against Metro Parks fails, the action against these two men in their official capacities likewise fails. The plaintiffs' action against DeNicola and White Buffalo fails because the plaintiffs cannot show that these private parties were state actors. We need not reach the underlying merits of the First Amendment claim, because none of the defendants are liable under 42 U.S.C. § 1983. Accordingly, we affirm the district court's grant of summary judgment to all of the defendants with respect to this aspect of the plaintiffs' § 1983 claim.

---

[6] DeNicola and White Buffalo argue that the plaintiffs have forfeited any argument under the state-compulsion test or the nexus test. The plaintiffs sufficiently developed arguments under both tests; thus, the forfeiture argument lacks merit.

## C. Privacy Protection Act

The district court also granted summary judgment to the defendants on the plaintiffs' claim under the Privacy Protection Act, 42 U.S.C. § 2000aa(b) ("PPA"). Under the PPA, "the government, in connection with the investigation or prosecution of a criminal offense, is prohibited from searching for or seizing any documentary . . . materials 'possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication.'" *United States v. Any & All Radio Station Transmission Equip.*, 218 F.3d 543, 551 n.4 (6th Cir. 2000) (quoting 42 U.S.C. § 2000aa(b)).

The district court determined that the statute did not apply in this case because "the rangers did not search for or seize the cameras in connection with the investigation or prosecution of a criminal offense." J.A. at 44 (Opinion at 9). Because the rangers happened upon the cameras while engaging in the deer-culling operation, the district court concluded that there was no "search." *Id.* Further, the district court determined that there was no "seizure" because the cameras were not taken down "'in connection with' the investigation or prosecution of a criminal offense." *Id.* Even though the plaintiffs were investigated for trespass, the district court stated that "those charges were initiated after the cameras were discovered, i.e.[,] the cameras were not allegedly seized in connection with the investigation for trespass." *Id.*

Although we disagree with the district court's analysis, we agree that the defendants were entitled to summary judgment in their favor on the PPA claim. Although there is a genuine issue of fact, there is no genuine issue of *material* fact, and the defendants are entitled to a judgment as a matter of law.

The plaintiffs argue that the district court erred because there is a fact dispute about when the criminal investigation began. In the plaintiffs' view, the criminal investigation started as soon as the first camera was discovered. In support of this position, the plaintiffs point out that as soon as the defendants located the first camera, the deer-culling operation was cancelled for the night, and the defendants instead focused on locating the other cameras. This "investigation" went on for the rest of the night and part of the next day. The plaintiffs also point out that a Metro Parks employee filled out a "Report of Investigation," describing the "[t]ype of [i]ncident" in part as a "[c]riminal [t]respass," and stating that the date of the "crime" was February 29, 2004. J.A. at 340 (Report of Investigation at 1). This is the date on which Simon discovered the first camera and the rangers began looking for other cameras.

We agree with the plaintiffs that a fact-finder could determine that, as soon as the defendants discovered the first camera, the defendants commenced a criminal investigation for trespass, and that therefore, there is a genuine issue of fact as to whether the confiscation of the cameras (except for the first one discovered) constituted a search and seizure under the PPA. However, we do not find this disputed fact to be material, because even if a fact-finder arrived at this conclusion, the PPA contains an exception which would bar the plaintiffs from relief.

If the plaintiffs are correct and the defendants were investigating the plaintiffs for criminal trespass during the period when the defendants looked for the cameras, then the defendants prevail as a matter of law because of the "suspect exception" to the PPA. "The goal of the [PPA] is to protect innocent third parties in possession of documents and papers from governmental intrusions which would unnecessarily subject their files and papers to search and seizure. Consequently, it is these persons who may avail themselves of the remedy provided by the statute." S. Rep. 96-874, at 15 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3950, 3961. In light of its statutory purpose, the PPA generally allows the government to search for or seize documents when "there is probable cause to believe that the person possessing such materials has committed or is committing the

criminal offense to which the materials relate," 42 U.S.C. § 2000aa(b)(1), and when "the offense [does] not involve the communication of the materials." *Guest v. Leis*, 255 F.3d 325, 341 (6th Cir. 2001) (footnote omitted).

In this case, accepting the plaintiffs' version of the facts as true, if a fact-finder determined that the defendants were investigating the plaintiffs for trespass, then the investigation would have logically commenced as the result of the defendants finding the first camera. The defendants could suspect trespass in this case because they found the camera installed in a location off established paths such that plaintiffs would arguably have had to trespass in order to gain access. Thus, the cameras "relate" to the alleged trespass offense. Further, the offense of trespass does not involve the communication of the materials themselves. Assuming that the defendants were engaged in a investigation, there were no "innocent third parties" whose rights were violated by a government investigation. Both the target of the investigation and the party who was subject to the search and seizure are one in the same. Accordingly, the "suspect exception" to the PPA would preclude the plaintiffs from prevailing on this claim.[7]

With respect to the PPA claim, there is no genuine issue of *material* fact. If the defendants were not conducting a criminal investigation when they found and removed the cameras, then the plaintiffs cannot prevail, because the PPA provision of § 2000aa applies only when there is a criminal investigation or prosecution. If the defendants were conducting a criminal investigation when they found and removed the cameras, then the plaintiffs cannot prevail, because the plaintiffs were the subjects of the criminal investigation for trespass, the cameras related to that investigation, and the PPA specifically provides for a suspect exception in such circumstances. Accordingly, we conclude that the district court was correct in granting the defendants' motions for summary judgment on the PPA claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to the defendants.

---

[7] We note that White Buffalo and DeNicola are excluded from liability under the PPA because they were not government actors. *See* 42 U.S.C. § 2000aa(b).